Filed 3/20/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | | |
|---|---|---|---|
| THE PEOPLE, | ) | | |
| | ) | | |
| Plaintiff and Respondent, | ) | | |
| | ) | S218197 | |
| v. | ) | | |
| | ) | Ct.App. 6 H039603 | |
| IGNACIO GARCIA, | ) | | |
| | ) | Santa Clara County | |
| Defendant and Appellant. | ) | Super. Ct. No. C1243927 | |
| _____ | ) | | |

According to the Center for Sex Offender Management (CSOM), one in every five girls and one in every seven boys is sexually abused by the time they reach adulthood. Among adults, one in six women and one in 33 men suffer sexual assault. (CSOM, U.S. Dept. of Justice, Fact Sheet: What You Need to Know About Sex Offenders (2008) p. 1 <www.csom.org/pubs/needtoknow_fs.pdf> [as of March 20, 2017].) Yet only about 30 percent of sexual assaults are reported to law enforcement. (Off. of Sex Offender Sentencing, Monitoring, Registering, and Tracking, U.S. Dept. of Justice, Facts and Statistics, <www.nsopw.gov/en/Education/FactsStatistics#sexualabuse> [as of March 20, 2017].)

Despite rising incarceration rates, the majority of known sex offenders at any given time are not in prison — and most sex offenders who are imprisoned will eventually be released. (Nat. Governors Assn. Center for Best Practices, Managing Convicted Sex Offenders in the Community (Apr. 2008) pp. 1-2 <www.nga.org/files/live/sites/NGA/files/pdf/0711SEXOFFENDERBRIEF.PDF>

SEE CONCURRING OPINION.

[as of March 20, 2017].)  Like most jurisdictions, California requires convicted sex offenders to register as a means of enabling law enforcement to manage the serious risk to the public of recidivism.  (*In re Alva* (2004) 33 Cal.4th 254, 279.)

During the five-year period from 2006 to 2011, the number of registered sex offenders in the United States increased 23.2 percent.  (Nat. Center for Missing & Exploited Children, Number of Registered Sex Offenders in the U.S. Nears Three-quarters of a Million (Jan. 2012) <www.missingkids.com/News/page/4615> [as of March 20, 2017].)  Today, over 850,000 sex offenders are registered throughout the United States.  (Nat. Center for Missing & Exploited Children, Map of Registered Sex Offenders in the United States (Dec. 2016) <www.missingkids.com/en_US/documents/Sex_Offenders_Map.pdf> [as of March 20, 2017].)  California alone has 75,000 — more than any other state.  (Off. of Atty. Gen., Cal. Megan's Law Website <www.meganslaw.ca.gov/Statistics.aspx> [as of March 20, 2017]; Cal. Sex Offenders Management Bd., An Assessment of Current Management Practices of Adult Sex Offenders in California (Jan. 2008) p. 55.)  How to manage and supervise these offenders is one of the most difficult challenges facing government policymakers today.

In response to this challenge, the Legislature in 2006 created the California Sex Offender Management Board (CASOMB) to analyze current practices and recommend improvements.  (Pen. Code, § 9001.)[1]  One of CASOMB's foundational principles was that sex offender management strategies should be based on reliable information and empirical research concerning the efficacy and cost effectiveness of different approaches.  (CASOMB, Recommendations Rep. (Jan. 2010) p. 12; see § 9001, subd. (i).)  Following a series of public hearings and

---

[1]     All further unlabeled statutory references are to the Penal Code.

meetings (§ 9002, subd. (b)), CASOMB issued a report recommending best practices in a variety of areas relating to the management of sex offenders, including their reentry into the community, supervision, housing, and treatment. (CASOMB, Recommendations Rep., *supra*, at pp. 5-6, 12.)  Some (but not all) of those recommendations were subsequently adopted by the Legislature in the Chelsea King Child Predator Prevention Act of 2010 (Chelsea's Law).  (Stats. 2010, ch. 219, § 1 et seq.)

One of the CASOMB report's conclusions was that sex offender treatment differs in important respects from ordinary psychotherapy.  Sex offenders can be required to participate in treatment, are not free to determine the nature and course of their own therapy, may be examined with a polygraph to verify the information they provide to their therapists and probation officers, and may encounter greater intrusions on the confidentiality of their discussions with treatment providers, so that probation officers can keep abreast of the offenders' progress and compliance with probation.  (CASOMB, Recommendations Rep., *supra*, at pp. 30-31.) CASOMB concluded that the increased supervision mandated by Chelsea's Law can pay substantial dividends:  sex offender-specific treatment has been shown to reduce recidivism by up to 40 percent.  (CASOMB, Recommendations Rep., *supra*, at p. 35.)

At issue in this appeal are two parts of Chelsea's Law, both relating to a sex offender's mandatory treatment.  Section 1203.067, subdivision (b)(3) requires a convicted sex offender, as a condition of probation, to waive "any privilege against self-incrimination" and to participate "in polygraph examinations, which shall be part of the sex offender management program."  Section 1203.067, subdivision (b)(4) requires, again as a condition of probation, a waiver by the convicted sex offender of the "psychotherapist-patient privilege to enable

communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09."

Defendant Ignacio Garcia contends that conditioning probation on the waiver of his privilege against self-incrimination, as well as on his participation in polygraph examinations, violates his Fifth Amendment rights. We conclude that the condition mandated by section 1203.067, subdivision (b)(3) directs defendant to answer fully and truthfully all questions posed to him as part of the sex offender management program. But because we deem his responses compelled within the meaning of the Fifth Amendment, they cannot lawfully be used against him in a criminal proceeding. (*Minnesota v. Murphy* (1984) 465 U.S. 420, 435, fn. 7 (*Murphy*); accord, *People v. Racklin* (2011) 195 Cal.App.4th 872, 880.) Where, as here, the responses would therefore pose no risk of incrimination, neither the fact that he was compelled to respond nor the fact that his responses were being monitored by a polygraph offends the Fifth Amendment.

We likewise reject defendant's claim that conditioning probation on the waiver of his psychotherapist-patient privilege violates his constitutional right to privacy and is overbroad under California law. It is neither overbroad nor violative of defendant's right to privacy to require a limited waiver of the psychotherapist-patient privilege for the purpose of enabling the treatment professional to consult with the probation officer and the polygraph examiner. We therefore affirm the judgment of the Court of Appeal.

## I. BACKGROUND

Originally charged with six counts of forcible lewd conduct with a child (§ 288, subd. (b)(1)), defendant pleaded no contest in a negotiated disposition to two counts of nonforcible lewd conduct. (§ 288, subd. (a).) The trial court suspended imposition of the sentence and placed defendant on probation for three years, ordered him to serve one year in jail and register as a sex offender, and

4

mandated his participation in an approved sex offender management program. Over defense objection, the court also imposed the two probation conditions that are the subject of this appeal: "The defendant shall waive any privilege against self-incrimination and participate in polygraph examinations, which shall be part of the sex offender management program, pursuant to Section 1203.067(b)(3) of the Penal Code" (the subdivision (b)(3) condition); and "The defendant shall waive any psychotherapist-patient privilege to enable communication between the sex offender management professional and the Probation Officer, pursuant to Section 1203.067(b)(4) and Section 290.09 of the Penal Code" (the subdivision (b)(4) condition).

Defendant appealed. He claimed that the coerced waiver of his privilege against self-incrimination and the required participation in polygraph examinations violated the Fifth Amendment and, like the mandated waiver of his psychotherapist-patient privilege, was unconstitutionally overbroad. The Court of Appeal affirmed. All three justices upheld the validity of the subdivision (b)(4) condition. The panel was divided, however, as to the validity of the subdivision (b)(3) condition. The majority reasoned that the choice defendant faced between forfeiting his privilege against self-incrimination (on the one hand) or asserting the privilege and having his probation revoked (on the other) would present " 'the classic penalty situation, [in which] the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and *inadmissible* in a criminal proceeding.' " Because "the mere extraction of compelled statements does not violate the Fifth Amendment" and no statements so extracted could be used against defendant in any criminal proceeding, it necessarily followed (according to the majority) that the subdivision (b)(3) condition did not violate the Fifth Amendment.

5

The majority also rejected the claim that the conditions were unconstitutionally overbroad. Addressing the required waiver of the privilege against self-incrimination and participation in polygraph examinations, the appellate court found these conditions closely tailored to the purpose of allowing "the state to discover the full extent of the risks created by the sex offender's freedom so that the state can respond with additional treatment, closer monitoring, and other measures necessary to protect the community." For similar reasons, the majority found that the waiver of the psychotherapist-patient privilege neither violated defendant's constitutional right to privacy nor was it overbroad.

Justice Grover concurred in part and dissented in part. In her view, "[t]he denial of probation for refusal to accept the mandated condition attaches an impermissible penalty to the exercise of the Fifth Amendment privilege" and is itself unconstitutional.

We granted review to consider the validity of the probation conditions mandated by section 1203.067, subdivision (b)(3) and (b)(4). Prior to oral argument, the Attorney General informed us that defendant had completed his probationary term. Although the question of these probation conditions' validity is now moot with respect to this defendant, we will exercise our inherent power to retain and decide the case so that we may settle an important issue that has divided the Court of Appeal. (See *People v. Moran* (2016) 1 Cal.5th 398, 408, fn. 8.)

## II. DISCUSSION

At any given moment, a substantial majority of convicted sex offenders are under some form of conditional supervision in the community. (CSOM, U.S. Dept. of Justice, Recidivism of Sex Offenders (2001) p. 1 <www.csom.org/pubs/recidsexof.html> ] [as of March 20, 2017].) Many jurisdictions have adopted a comprehensive approach to managing these sex offenders, under which treatment providers work together with supervising probation and parole agents to devise an

6

individualized supervision and treatment plan for each offender. Although the available data provide only a partial basis for inference, the findings of relevant studies appear consistent with the conclusion that offenders who receive comprehensive treatment have a significantly lower rate of recidivism and rearrest than offenders who did not participate in such treatment. (CSOM, U.S. Dept. of Justice, An Overview of Sex Offender Management (2002) pp. 1-2 <www.csom.org/pubs/csom_bro.pdf> [as of March 20, 2017].)

When Chelsea's Law was enacted, California had been relying on a patchwork of management strategies that was crafted " 'piece by piece through separate and uncoordinated legislative and administrative actions.' " (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1844 (2009-2010 Reg. Sess.) as amended June 2, 2010, pp. 31-32.) The new provisions adopted a unified strategy for sex offender management known as the "Containment Model," which was characterized by CASOMB as " 'the *best practice* for community supervision of sex offenders.' " (*Ibid*., quoting CASOMB, Recommendations Rep., *supra*, at pp. 32-33.)

The Containment Model adopted by the Legislature depends on three interrelated elements: supervision and monitoring of the sex offender while on probation; sex offender-specific assessment and treatment; and the use of static, dynamic, and future assessments of the risk of reoffending, including the State Authorized Risk Assessment Tool for Sex Offenders (SARATSO). (CASOMB, Sex Offender Treatment Program Certification Requirements (2014 rev.) pp. 6, 8; Sen. Appropriations Com., Analysis of Assem. Bill No. 1844 (2009-2010 Reg. Sess.) as amended Aug. 2, 2010, p. 5.) A major premise of the model is that the mental health professional, probation officer, and polygraph examiner will work together closely to assess the offender's compliance with, and participation in, the treatment program as well as the offender's risk of reoffending. (Sen. Com. on

Public Safety, Bill Analysis of Assem. Bill No. 1844, *supra*, at p. 33.) Indeed, the law specifies that the treatment professional *must* communicate with the offender's probation officer on a regular basis (or at least once a month) and share pertinent information with the certified polygraph examiner "as required." (§ 290.09, subd. (c).)

In enacting a statutory framework to implement the Containment Model, the Legislature directed CASOMB to develop and maintain standards for certification of sex offender management programs, professionals, and polygraph examiners. (§ 9003, subds. (a), (b), (d).) The relevant standards require the containment team to obtain accurate information about the offender's prior victims, the offender's access to potential new victims, and the high-risk behavior unique to that sex offender — especially when that history includes categories of victims or types of behavior stretching beyond the crimes of conviction. Postconviction polygraph examinations are used to elicit and verify this information. (CASOMB, Post-Conviction Sex Offender Polygraph Certification Standards (June 2011) pp. 10-23; see § 9003, subd. (b) ["programs shall include polygraph examinations"].) According to the theory of the model, a polygraph examination (or the threat of one) encourages the offender to be more complete and accurate when detailing his or her sexual history, provides a method of verifying whether the offender is currently engaging in or planning to engage in unlawful behavior, and helps disrupt the pattern of denial that " 'is generally regarded as a main impediment to successful therapy.' " (*McKune v. Lile* (2002) 536 U.S. 24, 33 (plur. opn. of Kennedy, J.); see English et al., *Community Containment of Sex Offender Risk: A Promising Approach* in Protecting Society From Sexually Dangerous Offenders: Law, Justice, and Therapy (Winick & LaFond edits., 2003) p. 266.) The supervising probation or parole officer then uses information obtained through treatment and verified by the polygraph

8

examination to assess the risk posed by the offender and take appropriate remedial action. (*Ibid*.)

This approach depends on the cooperative efforts and expertise of each part of the containment team. Accordingly, CASOMB concluded that adoption of the full model was necessary to reduce the risk associated with managing convicted sex offenders on probation. (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1844, *supra*, at pp. 30-31, quoting CASOMB letter to Assemblyman Fletcher.) What CASOMB asserted, in particular, is that the absence of open and ongoing communication among the professionals and others involved in the offender's supervision "compromises the purpose of the containment team approach and may jeopardize the safety of the community." (CASOMB, Sex Offender Treatment Program Certification Requirements, *supra*, at p. 12.)

Following this recommendation, the Legislature mandated certain conditions for any registered sex offender placed on probation. Among these are participation and successful completion of an approved sex offender management program (§ 1203.067, subd. (b)(1), (2)); waiver of the privilege against self-incrimination and participation in polygraph examinations as part of the sex offender management program (*id*., subd. (b)(3)); and waiver of the psychotherapist-patient privilege to enable communication between the sex offender management professional and the supervising probation officer and polygraph examiner (*id*., subd. (b)(4)). At issue in this appeal is the constitutionality, under both state and federal law, of the subdivision (b)(3) and (b)(4) conditions.

A. *The Validity of the Probation Condition Requiring Waiver of the Privilege Against Self-Incrimination and Participation in Polygraph Examinations (the Subdivision (b)(3) Condition)*

1. Waiver of the privilege against self-incrimination

9

Defendant's argument that section 1203.067, subdivision (b)(3) imposes an invalid condition rests on two contentions: (1) that the probation condition requires him to waive his Fifth Amendment privilege, and (2) that a coerced waiver of his Fifth Amendment privilege is unconstitutional. Although we agree that a coerced waiver of the privilege against self-incrimination would raise serious constitutional questions, our examination of the subdivision (b)(3) condition in its proper context, as well as the structure and purpose of Chelsea's Law, demonstrates that the Legislature has not actually required probationers to waive the protections of the Fifth Amendment. The condition is properly read instead to require that probationers answer all questions posed by the containment team fully and truthfully, with the knowledge that these compelled responses could not be used against them in a subsequent criminal proceeding. Because there is no Fifth Amendment privilege against compelled disclosure of information that cannot be used to incriminate the probationer (*Fisher v. United States* (1976) 425 U.S. 391, 400-401; accord, *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1134 (*Maldonado*)), it follows that the condition, properly understood, does not violate the Fifth Amendment.

We begin with the construction proposed by defendant. The subdivision (b)(3) condition, he asserts, should be interpreted in the broadest manner as requiring him to waive all of his Fifth Amendment protections, including the right to bar use of his compelled statements in a criminal trial. But this construction, he concludes, is unconstitutional under well-established precedent. In short, defendant argues that the Legislature enacted a patently unconstitutional statute, and that we have no choice but to strike it down.

Defendant is correct that it would raise serious constitutional questions to require defendants to waive their privilege against self-incrimination as a condition of probation. As the high court has explained, " 'a State may not impose

substantial penalties because a witness elects to exercise [the] Fifth Amendment right not to give incriminating testimony . . . .' " (*Murphy*, *supra*, 465 U.S. at p. 434.) For example, the government cannot condition a benefit such as public employment on a waiver of the privilege against self-incrimination, even if the waiver is ultimately deemed ineffective. (*Sanitation Men v. Sanitation Comm'r* (1968) 392 U.S. 280, 283-285; *Gardner v. Broderick* (1967) 392 U.S. 273, 279 ["the mandate of the great privilege against self-incrimination does not tolerate the attempt, regardless of its ultimate effectiveness, to coerce a waiver of the immunity it confers on penalty of the loss of employment"]; accord, *Spielbauer v. County of Santa Clara* (2009) 45 Cal.4th 704, 720 ["the Fifth Amendment forbids dismissal from public employment for refusal to surrender the privilege against self-incrimination"].) The high court has also found "a substantial basis in our cases" to support the proposition that conditioning a grant of probation on surrender of the Fifth Amendment privilege would likewise "create[] the classic penalty situation" and thus be unconstitutional. (*Murphy*, at p. 435; see *id*. at p. 436 [requiring a defendant "to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent" is "the extra, impermissible step"].) As in the other "penalty" cases, the statements of a probationer faced with such a choice would be inadmissible in a criminal prosecution. (*Id*. at p. 435.)

The People do not dispute defendant's characterization of *Murphy* or his contention that it would be unconstitutional to condition a grant of probation on surrender of his Fifth Amendment privilege. What they claim instead is that we must reject defendant's broad construction of the subdivision (b)(3) condition and consider whether the condition can reasonably be construed in a manner that is consistent with the Constitution. They rely on the doctrine of constitutional avoidance.

11

Under the doctrine, a statute should not be construed to violate the Constitution " ' "if any other possible construction remains available." ' " (*People v. Trujeque* (2015) 61 Cal.4th 227, 256; accord, *DeBartolo Corp. v. Fla. Gulf Coast Trades Council* (1988) 485 U.S. 568, 575 ["where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"].)  The theory underlying the canon rests not only on a preference for avoiding the unnecessary resolution of constitutional questions, but also on the presumption that the Legislature (whose members have sworn to uphold the Constitution) did not "intend[] to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." (*DeBartolo Corp.*, at p. 575; see *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 509.)  The basis for that presumption is especially strong in this case.  Not only did the high court's *Murphy* decision predate the enactment of Chelsea's Law by over 25 years, but that same decision also set out with some care how a state *should* go about establishing a valid way of obtaining the information necessary to monitor probationers released into the community.  As the high court explained, "a State may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination." (*Murphy*, *supra*, 465 U.S. at p. 435, fn. 7.)

Defendant nonetheless claims the avoidance canon is inapplicable here. The subdivision (b)(3) condition, he contends, is unambiguous and must be accorded its literal meaning:  that it requires the waiver of *any* privilege against self-incrimination.  The People, by contrast, argue that the condition is ambiguous, and conclude that "the historical context, the plain language, and the positioning of the waiver all indicate that the Legislature intended to limit invocation of the

12

privilege against self-incrimination only in the narrow context of probation supervision and treatment," without precluding probationers from objecting "to the admission of compelled statements in later *criminal* proceedings." Under this interpretation, the word "any" in subdivision (b)(3) would not refer to all aspects of the self-incrimination privilege, but rather to "any" right to remain silent that probationers might assert as a basis for refusing to answer questions posed by the containment team. What we find is that defendant's construction places too much reliance on one particular reading of the provision's text, and too little on the provision's purpose and context.

Text may sometimes seem unambiguous in isolation, even as it harbors greater complexity when considered in the context of surrounding provisions and the overall statutory structure. (*Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1391-1392 (conc. opn. of Cuéllar, J.), citing *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276, and *Hodges v. Superior Court* (1999) 21 Cal.4th 109, 114.) Both the Penal Code (see § 7, subd. 16) and our case law (*People v. Leiva* (2013) 56 Cal.4th 498, 506) direct us to construe words and phrases according to their statutory context. We consider the text in conjunction with the context and purpose of the statute even where, as here, the statutory language has a "highly technical" meaning. (*Zuni Public School Dist. No. 89 v. Department of Education* (2007) 550 U.S. 81, 99.)

Our primary task, after all, is to identify and effectuate the underlying purpose of the law we are construing. (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.) The statutory provision here describes the waiver term of probation as "part of the sex offender management program." (§ 1203.067, subd. (b)(3).) Other parts of the same subdivision provide that participation in a sex offender management program for at least a year is a requirement of probation, as is successful completion of the program, and that the program must follow the

13

standards developed by CASOMB. (*Id*., subd. (b)(2), citing § 9003.) Those standards emphasize the need for complete and accurate information about the probationer's prior victims, the probationer's access to potential new victims, and the high-risk behavior unique to that sex offender. It is precisely such information that is meant to be elicited by the psychotherapist and probation officer, and verified by polygraph examinations. (CASOMB, Post-Conviction Sex Offender Polygraph Certification Standards, *supra*, pp. 10-23.)

So any reasonable understanding of statutory purpose here must acknowledge the Containment Model's dependence on the information shared by the probationer. The People contend that the model's pillars are (1) measures designed to ensure the accuracy and completeness of the information provided by sex offenders to treatment professionals, and (2) collaboration and communication among the containment team members to enable development of an individualized treatment plan and to ensure the offender's compliance with it. The model contemplates that the privilege against self-incrimination must not be used to impede treatment professionals from eliciting a full disclosure of the offender's sex offense history, which is verified for completeness and accuracy by the polygraph examination. The containment team, in turn, uses the verified information to formulate an accurate risk profile and monitoring plan with the goal of preventing recidivism and promoting public safety. Depriving the containment team of the ability to insist on answers to their questions would, according to the People, "undercut[] this core pillar of the model." (See *State v. Fuller* (Mont. 1996) 915 P.2d 809, 816 ["a defendant who refuses to disclose his offense history cannot be successfully treated"].)

The purpose of the subdivision (b)(3) condition can thus be understood as a means of ensuring that the probationer fully, and accurately, answers questions pertinent to the sex offender management program. Without that insight into the

14

probationer's history and current state of mind, the containment team would be seriously hampered in its vital task of monitoring the probationer in the community. If the containment team is to fulfill its proper role in the offender management system, the flow of information to the team must not be subject to disruption by a probationer's assertion of the privilege against self-incrimination.

Because it would frustrate the purpose of the subdivision (b)(3) condition for a probationer to engage in a valid assertion of the privilege that thwarts a core premise of the sex offender management program, it would make no sense to interpret the condition as compelling a waiver that the People concede would be unconstitutional. The People acknowledge the need to read the text of the subdivision (b)(3) condition in the context of the statutory scheme and its purpose. (See generally *In re Application of Haines* (1925) 195 Cal. 605, 612 ["To arrive at the legislative intent in the interpretation of statutes the original purpose and object of the legislation must be considered"], disapproved on other grounds in *In re Culver* (1968) 69 Cal.2d 898, 904-905 & fn. 8.) There is no indication in the structure of Chelsea's Law or in its legislative history that the Legislature expected (in defiance of the high court's *Murphy* decision) that the fruits of the probationer's statements would be admissible in a subsequent criminal prosecution. In short, defendant's construction of the subdivision (b)(3) condition is inconsistent with the statutory purpose. So we must reject it. (*People v. Leiva*, *supra*, 56 Cal.4th at p. 506.)

We conclude instead that the subdivision (b)(3) condition may reasonably be construed in a manner that is both constitutional and consistent with the purpose of Chelsea's Law. (See *People v. Chandler* (2014) 60 Cal.4th 508, 524.) The subdivision (b)(3) condition does no more than allow the containment team to overcome the probationer's Fifth Amendment objections when the team poses potentially incriminating questions. Under this construction, a probationer is

required to answer the questions posed by the containment team, on pain of probation revocation should the probationer refuse.  In turn, the probationer's compelled responses may not be used against the probationer in a subsequent criminal prosecution.  (*Murphy*, *supra*, 465 U.S. at p. 435 & fn. 7.)

This construction adequately safeguards a probationer's Fifth Amendment rights.  The Fifth Amendment prohibits the government from using statements compelled under the subdivision (b)(3) condition against the probationer in a criminal trial, whether as direct evidence of guilt or as impeachment.  (*New Jersey v. Portash* (1979) 440 U.S. 450, 458-459.)  It also prevents the government from exploiting the information gleaned from those statements to discover other evidence of guilt.  (*Wong Sun v. United States* (1963) 371 U.S. 471, 487-488.)  Once a defendant demonstrates that he or she was compelled to disclose evidence of criminal conduct as part of the sex offender management program — which could ordinarily be established by the defendant's uncontradicted declaration to that effect — the burden shifts to the prosecution in a criminal proceeding to demonstrate that its evidence was untainted by the defendant's prior statements.  (See *Kastigar v. United States* (1972) 406 U.S. 441, 460.)  That is, the government remains free to undertake a prosecution for those crimes, but it bears a "heavy burden" to show that its evidence was derived from a legitimate source wholly independent of the compelled testimony.  (*Id*. at p. 461; accord, *Maldonado*, *supra*, 53 Cal.4th at pp. 1138-1139, fn. 17.)

We therefore interpret the subdivision (b)(3) condition as directing the probationer, in the context of questioning by the containment team, to exchange the privilege against self-incrimination for an immunity against prosecutorial use of the compelled responses.  (See *United States v. Balsys* (1998) 524 U.S. 666, 682.)  As this court has previously explained, the Fifth Amendment does not establish a privilege against the compelled disclosure of information; rather, it

16

"precludes the use of such evidence in a criminal prosecution against the person from whom it was compelled." (*Maldonado*, *supra*, 53 Cal.4th at p. 1134.)

At the People's invitation — and to remove any doubt on this score — we explicitly declare that probationers have immunity against the direct and derivative use of any compelled statements elicited under the subdivision (b)(3) condition. (See *United States v. Balsys*, *supra*, 524 U.S. at p. 683, fn. 8 ["the prediction that a court in a future criminal prosecution would be obligated to protect against the evidentiary use of compelled testimony is not enough to satisfy the privilege against compelled self-incrimination"]; cf. *Maldonado*, *supra*, 53 Cal.4th at p. 1129, fn. 10 [declaring judicial immunity against use in prosecution's case-in-chief of an accused's compelled statement to a prosecution mental health expert]; accord, *State v. Evans* (Wis. 1977) 252 N.W.2d 664, 668 [declaring judicial immunity against use of incriminating information disclosed under compulsion by a probationer or parolee to a probation or parole agent "[i]n order to guarantee the fifth amendment rights of a probationer or a parolee and at the same time to preserve the integrity of the probation system"].) We further agree with the People that the probationer must be made aware of the protection afforded statements compelled in the course of the sex offender management program. In particular, a probationer must be advised, before treatment begins, that no compelled statement elicited under questioning in the course of the mandatory sex offender management program (or the fruits thereof) may be used against him or her in a subsequent criminal prosecution. (Cf. *Evans*, *supra*, at pp. 668-669 [declaring that a probationer or parolee should be made aware that potentially

incriminating answers compelled under questioning by a probation or parole officer cannot be used in a subsequent criminal proceeding].)[2]

## 2. Participation in polygraph examinations

The trial court also conditioned defendant's probation on his participation in polygraph examinations connected to the sex offender management program. Defendant argues that mandating the use of polygraph examinations to "elicit incriminating information" about "uncharged offenses" violates the Fifth Amendment. But as explained earlier, the information elicited under compulsion by the containment team in interviews and by polygraph examinations may not be used against the probationer in a criminal prosecution and therefore does not offend the Fifth Amendment. (*Brown v. Superior Court* (2002) 101 Cal.App.4th 313, 320 ["if the questions put to the probationer [during the polygraph examination] are relevant to his probationary status and pose no realistic threat of incrimination in a separate criminal proceeding, the Fifth Amendment privilege would not be available and the probationer would be required to answer those questions truthfully"]; accord, *United States v. Locke* (5th Cir. 2007) 482 F.3d 764, 767 ["The fact that the questions were asked to Locke in the context of a polygraph test does not convert the question-and-answer session into a Fifth Amendment violation"].)

---

[2] If defendant had been successful in invalidating the subdivision (b)(3) condition, it might have had paradoxical consequences for him and for other sex offenders who are granted probation. Without the assurance that the containment team would be able to uncover the extent of a probationer's vulnerabilities and monitor the probationer's progress, a trial court might well conclude that the sex offender was not a good candidate for probation and must instead be sentenced to prison. (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1844, *supra*, at pp. 30-31.)

Defendant complains next that the scope of the mandated examinations under the subdivision (b)(3) condition is not limited to prior or potential sex offenses but would permit a polygraph examiner to ask "anything at all, without limitation," including questions about "his medical history or personal financial matters having nothing to do with any criminal conduct." He contends that requiring him to participate in polygraph examinations of unlimited scope would be overbroad and that the condition should be narrowed.

We reject the claim of overbreadth here. The scope of the polygraph examination is not unbounded, as defendant suggests. Rather, it is limited to that which is reasonably necessary to promote the goals of probation. As the Court of Appeal pointed out, the polygraph testing condition is expressly linked to the purposes and needs of the sex offender management program. (See § 1203.067, subd. (b)(3) [requiring "participation in polygraph examinations, which shall be part of the sex offender management program"].) That program requires disclosure of each prior sex offense so as to enable identification of the psychological and physiological factors associated with the probationer's crimes and development of a plan to reform and rehabilitate the probationer. The polygraph is a reasonable means of verifying the accuracy and completeness of those disclosures and of ensuring the probationer's compliance with treatment and supervision, both of which allow the containment team to discover and monitor the risks posed by the probationer's release to the community. (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 129, fn. 17.) Because the scope of the polygraph examination is already focused by its terms on criminal conduct related to the sex offender management program, it is a valid condition of probation and does not require further limitation. (See *People v. Lent* (1975) 13 Cal.3d 481, 486.) The polygraph examination, of course, may also include questions unrelated to the probationer's treatment and supervision but that are reasonably necessary to

19

establish a baseline physiological response.  Such questions do not render the condition overbroad.

B.    *The Constitutionality of the Probation Condition Requiring Waiver of the Psychotherapist-patient Privilege* (*the Subdivision (b)(4) Condition*)

Defendant contends that the condition requiring him to waive his psychotherapist-patient privilege violates his right to privacy and is unconstitutionally overbroad.  As we recently did in *People v. Gonzales* (2013) 56 Cal.4th 353, 385 (*Gonzales*), we will assume (without deciding) that the federal Constitution can in some circumstances protect convicted sex offenders from governmentally compelled disclosure of privileged communications with their psychotherapists.  We nonetheless conclude that the subdivision (b)(4) condition is not unconstitutional.[3]

To determine whether the sharing of confidential communications between defendant and his psychotherapist (see Evid. Code, § 1012) with certain members of the containment team would violate defendant's asserted federal constitutional right to privacy, we balance the particular intrusion on defendant's privacy against the justification for the probation condition.  (*Gonzales*, *supra*, 56 Cal.4th at p. 386.)  Defendant, as a probationer, has a diminished expectation of liberty and privacy as compared to an ordinary citizen.  (*United States v. Knights* (2001) 534 U.S. 112, 119.)  In addition, the waiver required by the probation condition is quite narrow.  By its express terms, the waiver is limited to that which is necessary "to enable communication between the sex offender management professional and

---

[3]    Defendant purports to assert claims under both the federal and state rights to privacy, but provides no separate analysis of the protection afforded by the state Constitution.  We therefore restrict our discussion to the federal claim.  (See *People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19.)

20

supervising probation officer, pursuant to Section 290.09." (§ 1203.067, subd. (b)(4).) Consequently, a probationer's confidential communications may be shared only with the probation officer and the certified polygraph examiner, who is likewise explicitly authorized to receive "pertinent information . . . as required" from the sex offender management professional under subdivision (c) of section 290.09. (See § 9003, subd. (b) [sex offender management programs provided by sex offender management professionals "shall include polygraph examinations by a certified polygraph examiner"].)[4] The waiver does not relieve the psychotherapist, probation officer, or polygraph examiner of their duty to otherwise maintain the confidentiality of this information (although the mandatory reporting laws may themselves require a probation officer, psychotherapist, or other classified individual to inform the appropriate agencies about suspected child abuse or neglect (see §§ 11165.7, subd. (a)(15), (18), (21), (34), 11165.9), nor does it divest defendant of the ability to assert the privilege to prevent further disclosure of the shared communications. (CASOMB, Post-Conviction Sex Offender Polygraph Certification Standards, *supra*, at p. 5.) We expect that the members of the containment team will act in accordance with their professional obligations and ensure the integrity of the process. Section 11167.5, moreover, criminalizes unauthorized disclosure of confidential information elicited under the mandatory reporting law.

Against that limited intrusion, we must weigh the state's strong and legitimate interest. The core of that interest is allowing the psychotherapist,

---

[4] The sex offender management professional must also provide the offender's SARATSO score to the probation officer, who in turn must provide the score to the Department of Justice. The score is then made available on the California Sex and Arson Registry website. (§ 290.09, subd. (b)(2).)

probation officer, and polygraph examiner to exchange relevant information about a probationer's reformation and rehabilitation, including information disclosed during the probationer's therapy. (§ 290.03, subds. (a), (b).) The Legislature has recognized that the effectiveness of the Containment Model depends on " 'open and ongoing communication' " among the professionals involved in " 'supervising, assessing, evaluating, treating, supporting, and monitoring sex offenders.' " (*Gonzales*, *supra*, 56 Cal.4th at p. 377.) Unless these professionals can communicate freely about the probationer's situation, the purpose of the Containment Model may be compromised and the safety of the community may be placed in jeopardy. (*Ibid*.)

In *Gonzales*, we did not have occasion to consider the validity and effect of an analogous waiver condition for parolees. Those provisions had not yet gone into effect at the time the defendant there was placed on parole and participated in parole-mandated therapy. (*Gonzales*, *supra*, 56 Cal.4th at p. 378, fn. 9.) Moreover, the intrusion on the psychotherapist-patient privilege in *Gonzales* was more substantial than in this case. The confidential communications were shared, over the parolee's objection, with the government, *and* were introduced at trial on the petition to commit the parolee as a sexually violent predator. (*Id*. at p. 357.) But applying a weighing process similar to what we apply here, *Gonzales* held that the involuntary disclosure and use of a parolee's confidential communications with his psychotherapist, while state law error, was not a violation of the parolee's federal constitutional right to privacy. (*Id*. at p. 388.) It follows that the more limited intrusion on the privilege in this case did not violate defendant's federal right to privacy, either. (See *In re Christopher M*. (2005) 127 Cal.App.4th 684, 695 [probation condition requiring disclosure to the probation officer and the court of all records concerning the juvenile's court-ordered medical and psychological

22

treatment did not violate the federal right to privacy], disapproved on other grounds in *Gonzales*, at p. 375, fn. 6.)

Even without any waiver of the psychotherapist-patient privilege, the psychotherapist has a statutory duty to report suspected child abuse or neglect. (§ 11165.7, subd. (a)(21); see generally *People v. Stritzinger* (1983) 34 Cal.3d 505, 512.) The possibility that a probation officer or polygraph examiner might also qualify as a mandatory reporter does not materially alter the intrusion on a defendant's privacy.

We likewise reject defendant's claim that the subdivision (b)(4) condition is unconstitutionally overbroad. The required waiver extends only so far as is reasonably necessary to enable the probation officer and polygraph examiner to understand the challenges defendant presents and to measure the effectiveness of the treatment and monitoring program. (Cf. *Gonzales*, *supra*, 56 Cal.4th at p. 377 [noting that the analogous waiver of the privilege in § 3008, subd. (d) extends only to what "is considered necessary to the effective functioning of the parole process with regard to the parolee in question"].) Defendant's assertion that these goals can be achieved without disclosure of *any* privileged information — i.e., by limiting disclosures to a record of his attendance at therapy sessions and a general opinion as to whether he was cooperating and progressing — is flatly inconsistent with the Containment Model the Legislature adopted, and is supported by no evidence or even an explanation.

Defendant contends that his overbreadth argument finds support in *In re Corona* (2008) 160 Cal.App.4th 315. His reliance is misplaced. Corona, a sex offender, was required as a condition of parole to execute a waiver of his patient-therapist privilege to permit his parole officer to stay informed about information Corona disclosed during his state-reimbursed group therapy program. (*Id*. at p. 319.) But Corona did not challenge *that* waiver. Instead, he challenged the

validity of a waiver the state sought as to therapy he had voluntarily arranged with a *private* psychotherapist. In striking down only the latter waiver, the Court of Appeal concluded that the private therapy was something for which Corona should be credited, not penalized, and that the compelled waiver of the privilege concerning the private therapist would discourage Corona from obtaining needed treatment. (*Id*. at p. 321.) Because the waiver would therefore have a "reverse effect" on his reformation and rehabilitation, the Court of Appeal deemed it to be "unreasonable and unnecessary." (*Ibid*.) Here, by contrast, the therapy is itself a condition of probation and is provided by a state-paid therapist. (*Gonzales*, *supra*, 56 Cal.4th at p. 386.) And as the People indicate, the ongoing communication among members of the team remains essential to the Containment Model's success in reducing recidivism for convicted sex offenders. So the Legislature was entitled to conclude that the Containment Model, and the limited sharing of information it requires, would be more effective in rehabilitating and reforming a convicted sex offender than a model that maintained the privilege to its fullest extent. (Cf. *People v. Juarez* (2004) 114 Cal.App.4th 1095, 1104 ["A sentencing determination predicated on the judicial repudiation of legislative policy constitutes an abuse of discretion"].)

Finally, we find that the limited scope of the subdivision (b)(4) condition is consistent with *Regents of University of California v. Superior Court* (2008) 165 Cal.App.4th 672 (*Regents*) — a case on which defendant relies. In the underlying action there, the Regents had brought an antitrust suit against a group of energy suppliers. As part of discovery in the antitrust suit, the Regents requested materials protected by the attorney-client and work product privileges, which the defendants had previously disclosed to a federal corporate fraud task force. (*Id*. at p. 676.) The defendants had willingly disclosed these materials to demonstrate their "cooperation with the government" consistent with federal enforcement

24

guidelines and on the condition that "disclosure of information to the government was not a waiver of the attorney-client and work product privileges." (*Id.* at pp. 676-677.) The Regents contended that the disclosure constituted a waiver of the privilege for all purposes. (*Id.* at p. 677.)

In rejecting the claim that prior disclosure had effected a blanket waiver of privilege, the Court of Appeal accepted the uncontradicted allegations that each defendant believed it would have suffered severe regulatory or criminal consequences had it failed to share the requested information with the federal investigators. (*Regents*, *supra*, 165 Cal.App.4th at pp. 677-678.) The Court of Appeal then concluded that disclosure under such circumstances was a product of "coercion" within the meaning of Evidence Code section 912, subdivision (a) and thus did not constitute a waiver of the privilege for all purposes. (*Regents*, at pp. 683-684.)

In this case, defendant faced the choice between waiving his psychotherapist-patient privilege or going to prison. Defendant is correct that the condition involves an element of coercion, but he is mistaken in concluding that the condition thereby is invalid. Here, as in *Regents*, the disclosure does not cause the privilege to evaporate, because, as noted *ante* on page 16, the privileged information is disclosed under compulsion. (See Evid. Code, § 912, subd. (a).) The subdivision (b)(4) condition thus should be read to intrude on the privilege only to a limited extent: the extent specified in the condition itself, which describes what is reasonably necessary to enable communications among the psychotherapist, probation officer, and polygraph examiner; facilitate their understanding of the challenges defendant presents; and allow those containment team members to measure the effectiveness of the sex offender treatment and monitoring program. (Pen. Code, § 1203.067, subd. (b)(4).) In all other respects, the privilege remains intact. So construed, the condition is not overbroad.

25

### III.  DISPOSITION

When the Legislature adopted the Containment Model for the management of sex offenders who are granted probation, it balanced the constitutional interests of those sex offenders released into the community under supervision with the compelling need to protect public safety.  The success of that carefully wrought model depends on an accurate and complete understanding of the sex offender's criminal proclivities and vulnerabilities.  Read in light of the relevant constitutional provisions and the purpose of Chelsea's Law, the probation conditions challenged here enable those charged with monitoring the probationer to obtain the information they need, while otherwise safeguarding the probationer's privacy and protecting the probationer from compelled self-incrimination.  The judgment of the Court of Appeal is affirmed.

**CUÉLLAR, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**KRUGER, J.**

26

**CONCURRING OPINION BY KRUGER, J.**

Penal Code section 1203.067 requires criminal defendants who must register as sex offenders to participate in an approved sex offender management program as a condition of probation. For purposes of the program, the defendant must, among other things, waive "any privilege against self-incrimination" (Pen. Code, § 1203.067, subd. (b)(3)), participate in polygraph examinations, and waive "any psychotherapist-patient privilege to enable communication between the sex offender management professional and supervising probation officer" (*id.*, subd. (b)(4)). I join the majority in concluding that, properly construed, these conditions are not overbroad, do not violate the defendant's right to privacy, and do not violate the defendant's Fifth Amendment rights. I write separately to elaborate on my views on the proper construction of the condition requiring a waiver of "any privilege against self-incrimination." (*Id.*, subd. (b)(3).)

Defendant contends this self-incrimination waiver provision "preclude[s] any attempts by a probationer, present and future, to seek protection under the self-incrimination clause for compelled statements made during the sex offender management program." So construed, defendant contends, the condition violates the self-incrimination clause of the federal Constitution's Fifth Amendment by requiring probationers not only to respond to potentially incriminating official questions, but also to anticipatorily waive any right to object if the state later uses their answers against them in criminal proceedings. The Attorney General

disavows this interpretation.  He contends that the provision merely requires probationers to provide truthful answers to questions posed as part of the sex offender management program, and does not preclude probationers from objecting to the admission of compelled statements against them in later criminal proceedings.  On this narrower understanding of the required waiver, Penal Code section 1203.067, subdivision (b)(3) does no more than what the law clearly permits:  It has long been established that "a State may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding . . . ." (*Minnesota v. Murphy* (1984) 465 U.S. 420, 435, fn. 7 (*Murphy*).)

The Attorney General's argument relies on the canon of constitutional avoidance — that is, the principle that we will construe statutes to avoid serious constitutional problems if such a reading is fairly possible.  (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1373.)  Defendant contends that the Attorney General's narrow reading is not fairly possible, because the statutory requirement that probationers waive "any privilege against self-incrimination" admits of only one interpretation.  If that were so, the canon would have no application here.  The canon of constitutional avoidance is a tool of statutory interpretation that permits us to select between competing plausible interpretations of statutory text.  It does not permit us to " ' "do[] violence to the reasonable meaning of the language used" ' " (*ibid.*), nor does it provide "a method of adjudicating constitutional questions by other means" (*Clark v. Martinez* (2005) 543 U.S. 371, 381 (*Martinez*)).

The primary question before us, then, is whether the language of Penal Code section 1203.067 is susceptible of the reading the Attorney General urges.  It is.

2

To be sure, the requirement that probationers waive "any privilege against self-incrimination" is also susceptible to defendant's broader reading. Both this court and a majority of the members of the United States Supreme Court have said that the core constitutional right protected by the Fifth Amendment's self-incrimination clause is a privilege against the use of compelled statements in a criminal trial, not against the compulsion of those statements in the first instance. (See *Chavez v. Martinez* (2003) 538 U.S. 760, 767 (*Chavez*) (plur. opn. of Thomas, J.) ["Statements compelled by police interrogations of course may not be used against a defendant at trial, [citation], but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs."]; see also *id.* at p. 772 ["the core constitutional right defined by the Self-Incrimination Clause [is] the right not to be compelled in any criminal case to be a witness against oneself" (fn. omitted)]; *id.* at p. 777 (conc. opn. of Souter, J., joined by Breyer, J.); *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1128 (*Maldonado*) [adopting *Chavez*'s conclusion that "a 'core' Fifth Amendment violation is completed, not merely by official extraction of self-incriminatory answers from one who has not waived the privilege, but only if and when those answers are *used in a criminal proceeding* against the person who gave them"].) Understood against the backdrop of these decisions, the statutory requirement to waive the self-incrimination privilege is plausibly understood, as defendant argues, to mean waiving the right to object to the use of compelled statements in a criminal trial, not waiving any purported right to remain silent when asked incriminating questions as part of sex offender treatment.

But defendant's interpretation is not the only plausible interpretation of Penal Code section 1203.067, subdivision (b)(3) — nor is it the most reasonable one. While cases like *Chavez* and *Maldonado* have taken the view that the Fifth Amendment right is violated by the prosecution's use of compelled statements in

criminal proceedings, not the compulsion itself, the cases have also recognized a longstanding body of " '*prophylactic rules* designed to safeguard the core constitutional right protected by the Self-Incrimination Clause.' " (*Maldonado*, *supra*, 53 Cal.4th at p. 1128, quoting *Chavez, supra*, 538 U.S. at pp. 770-771 (plur. opn. of Thomas, J.).)  These rules permit an individual to assert the Fifth Amendment privilege if " ' "compelled to produce evidence which later *may* be used against him as an accused in a criminal action." ' " (*Ibid.*)

Common usage does not always respect this distinction between core constitutional right and prophylactic safeguard.  It is certainly not unusual to hear the phrase "privilege against self-incrimination" to refer to the assertion of the "right to remain silent" in the face of official questioning, as opposed to the assertion of the right to prevent the use of compelled statements in a later criminal proceeding.  Perhaps the most well-known example appears in *Miranda v. Arizona* (1966) 384 U.S. 436:  "Once warnings have been given, the subsequent procedure is clear.  If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.  At this point he has shown that *he intends to exercise his Fifth Amendment privilege*; any statement taken *after the person invokes his privilege* cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement *after the privilege has been once invoked*." (*Id*. at pp. 473-474, italics added, fn. omitted.)  Given that the United States Supreme Court itself has used the phrase "Fifth Amendment privilege" to mean "the right to remain silent," it is not too much of a stretch to imagine that the Legislature might have used the phrase "privilege against self-incrimination" to mean much the same thing.

4

Defendant's counterargument relies heavily on the Legislature's use of the word "any" to modify the term "privilege," contending that it unambiguously demonstrates the Legislature's desire to prohibit probationers from asserting *any version* of the "self-incrimination privilege" at *any* time and in *any* proceeding. It is, however, at least as likely that the Legislature used the word "any" because nothing about sex offender treatment necessarily implicates the privilege against self-incrimination; it is only if "any" incriminating questions are asked that "any privilege against self-incrimination" (Pen. Code, § 1203.067, subd. (b)(3)) might be invoked. Moreover, the Fifth Amendment privilege is not the only potentially applicable self-incrimination privilege: A criminal defendant might equally invoke article I, section 15 of the California Constitution ("Persons may not . . . be compelled in a criminal cause to be a witness against themselves"), or Evidence Code section 940 ("To the extent that such privilege exists under the Constitution of the United States or the State of California, a person has a privilege to refuse to disclose any matter that may tend to incriminate him"). The Legislature may have used the word "any" as a shorthand reference to all three of these provisions, rather than, as defendant argues, as a reservation of the state's prerogative to use probationers' incriminating statements against them in later criminal proceedings.

Nor does the remainder of Penal Code section 1203.067 suggest that the Legislature intended to require probationers to surrender any privilege against the use of their statements to prosecute them for criminal offenses. The evident focus of the provision is the proper functioning of the sex offender management program as a mechanism for treatment of participating sex offenders. (Pen. Code, § 1203.067, subd. (a)(3).) The provision makes no mention of the use of information gathered in the course of treatment, except "to enable communication between the sex offender management professional and supervising probation officer" (*id.*, subd. (b)(4)), who are, collectively, responsible for determining how

5

long the probationer must remain in the program. It contains no indication that the Legislature intended to require probationers to provide truthful answers not only for purposes of successful treatment, but also for purposes of facilitating criminal prosecution.

The statutory language is, in short, entirely susceptible of the narrow construction the Attorney General urges. That construction is consistent with the evident purpose of the sex offender management program — that is, to promote successful treatment of the participants. It is also consistent with established law. (See *Murphy*, *supra*, 465 U.S. at p. 435, fn. 7.) As between this construction and defendant's proffered construction, we presume the Legislature "did not intend the alternative which raises serious constitutional doubts." (*Martinez*, *supra*, 543 U.S. at p. 381.)

For all these reasons, in my view, the court is clearly correct to conclude that Penal Code section 1203.067, subdivision (b)(3)'s ambiguous language must be construed not as requiring probationers to waive the right to assert any self-incrimination privilege in criminal proceedings, but merely as barring probationers from attempting to use any such privilege as a basis for refusing to candidly discuss matters pertinent to the sex offender management program. So construed, the condition does not violate defendant's Fifth Amendment rights.

KRUGER, J.

I CONCUR:

LIU, J.

6

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Garcia
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 224 Cal.App.4th 1283
**Rehearing Granted**

_____

**Opinion No.** S218197
**Date Filed:** March 20, 2017
_____

**Court:** Superior
**County:** Santa Clara
**Judge:** Hector E. Ramon

_____

**Counsel:**

David D. Martin, under appointment by the Supreme Court, for Defendant and Appellant.

Law Offices of Daniel H. Willick and Daniel H. Willick for California Psychiatric Association, National Association of Social Workers and California Chapter of National Association of Social Workers as Amici Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Acting Attorney General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Seth K. Shalit, Lisa Ashley Ott, Laurence K. Sullivan, René A. Chacón and Leif M. Dautch, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David D. Martin
10 Sanderling Court
Sacramento, CA  95833
(916) 999-0200

Leif M. Dautch
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5089