Filed 5/13/19 (unmodified opinion attached)

CERTIFIED FOR PARTIAL PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SARA ARCELIA SALCIDO,<br><br>        Defendant and Appellant. | E067578<br><br>(Super.Ct.No. INF1501474)<br><br>ORDER MODIFYING OPINION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion filed in this matter on May 2, 2019 is modified as follows:

 Footnote * at the bottom of page one is modified to state,

        Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.

Except for this modification, the opinion remains unchanged. This modification does not effect a change in the judgment.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ_____

P. J.

1

Filed 5/2/19 (unmodified opinion)

See Concurring and Dissenting Opinion

**CERTIFIED FOR PARTIAL PUBLICATION\***

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | |
| v. | E067578 |
| SARA ARCELIA SALCIDO, | (Super.Ct.No. INF1501474) |
| Defendant and Appellant. | OPINION |

APPEAL from the Superior Court of Riverside County.  John G. Evans, Judge.

Affirmed.

Susan L. Ferguson, under appointment by the Court of Appeal, for Defendant and

Appellant.

---

\*        Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III and IV.

1

Xavier Becerra, Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Michael Pulos, Britton B. Lacy, and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Sara Salcido was in the business of providing immigration services — typically, obtaining visas for her clients that would allow them to stay in the United States legally. Under the Immigration Consultant Act (Bus. & Prof. Code, §§ 22440-22449) (Act), with certain exceptions, it is illegal for a person to act as an "immigration consultant" (as defined in the Act) unless he or she has complied with a host of consumer protection requirements, such as passing a background check and filing a bond. Defendant failed to comply with these.

As a result, in a bench trial, defendant was convicted on one count of unlawfully engaging in the business of an immigration consultant, a misdemeanor. (Bus. & Prof. Code, §§ 22440, 22441.) The People argued, however, that each time defendant took money from a client in exchange for providing immigration services, she was committing theft by false pretenses, because she was not a legally qualified immigration consultant under state law. The trial court agreed; thus, it also convicted her on six counts of grand theft (Pen. Code, §§ 484, 487, subd. (a)) and two counts of petty theft (Pen. Code, §§ 484, 488). It dismissed two additional counts of grand theft as time-barred. Defendant was placed on probation for five years.

In the published portion of this opinion, we will hold that federal law does not preempt the application of the Act to defendant. In the unpublished portion, we will reject defendant's other contentions. Accordingly, we will affirm.

I

FACTUAL BACKGROUND

A.      *Count 2:  Rigoberto S.*

In September 2012, Rigoberto S. paid defendant $4,480 to obtain a work permit and some kind of visa. He had seen an ad saying that she provided immigration services. He met with her in her office. However, he never received any documentation from the United States Citizenship and Immigration Services (USCIS) or from defendant. He contacted defendant, but she had no explanation, so he sued her in small claims court.

Defendant testified that she spent some 14 to 20 hours, across some six months, on Rigoberto S.'s case. Nine months after he first contacted her, she discovered that he had previously been deported. She did not file anything with the USCIS, because if she had, he would have been deported automatically. If she had known he had previously been deported, she would never have taken his case. She started paying back his money, in installments; by the time of the preliminary hearing, she had repaid $1,800.

B.      *Count 3:  Patricia F.*

In October 2011, Patricia F. paid defendant $3,000 to obtain a U visa.[1] They met at defendant's office.

---

[1]      A U visa is available to victims of certain crimes.

3

Defendant testified that she put in 50 hours on the case. It took her over a year to get the necessary signature from the relevant police department. She never actually filed anything for Flores because Flores saw "a lot of . . . bad comments on Facebook" and fired her.

C.     *Count 4:  Ivonne G.*

In June or July 2013, Ivonne G. paid defendant $3,000 to obtain a U visa. She had seen an ad for defendant's immigration services. They met at defendant's office.

Defendant testified that she had worked on Ivonne G.'s case for about a year and had done "some forms" when she was arrested.

D.     *Count 6:  Araceli C.*

In April 2014, Araceli C. paid defendant a down payment to help her obtain a green card based on marriage to a United States citizen. Over time, she paid defendant a total of $9,265. On defendant's advice, she divorced her husband and married her live-in boyfriend; defendant handled this paperwork. She learned from the USCIS, however, that defendant had done nothing about the green card.

Defendant testified that she spent 60 hours on the case before Araceli C. fired her.

E.     *Count 7:  Sofia L.*

In 2012, Sofia L. paid defendant a down payment to obtain U visas for herself and her children. She met with defendant at defendant's office. Over time, she paid defendant a total of $5,760. The USCIS determined that she did not qualify and that it

4

was going to deny her petition; as of the preliminary hearing, however, it had not actually done so, due to its backlog.

Defendant testified that she had spent 300 hours on the case.

F.      *Count 8:  Javier O.*

In 2014, Javier O. paid defendant $4,580 to assist him with obtaining a work permit.  He met with her at her office.  He never received any documentation indicating that she had done anything.

Defendant testified that she spent 30 hours on his case.  She filed some paperwork with the USCIS and spoke to a USCIS supervisor.

G.      *Count 9:  Maria T.*

In 2014, Maria T. paid defendant a down payment to assist her in obtaining a U visa or similar permit.  She had seen an ad for defendant's immigration services.  She met with defendant at defendant's office.  Over time, she paid defendant a total of $800.

Defendant testified that she spent 20 hours on the case.  She obtained the necessary signature of the relevant police department and filed some papers with the USCIS.  The case was still pending.  However, Maria T. fired her and sued her in small claims court.

H.      *Count 10:  Ilsia M.*

At the end of 2014 or the beginning of 2015, Ilsia M. paid defendant $300 to assist her in obtaining a U visa.  She never received any documentation from the government.

5

Defendant testified that she spent four to six hours on the case. She prepared some forms, but she could not send them in because she was arrested.

I.       *Additional Information Relevant to All Counts*

Defendant maintained an office in Cathedral City. Signs outside advertised the services that she provided, including immigration services.

Defendant admitted that she had been acting as an immigration consultant since 2007. She also admitted that she was not an attorney, though she was a paralegal. She admitted knowing that she was required to have a background check and to post a bond, but she had not done either.

Defendant testified that she learned in either September or November 2013 that she was required to be registered with the state and to post a bond. (At the preliminary hearing, however, she testified that she did not know about the background check until 2015.) She did not post a bond because she could not afford it.

It was stipulated that, at all relevant times, defendant engaged in the business or acted in the capacity of an immigration consultant, for compensation, even though she had not passed the required background check or posted the required bond. It was also stipulated that, at all relevant times, defendant held herself out as legally authorized to act as an immigration consultant. With respect to the last two victims — Maria T. and Ilsia M. — it was additionally stipulated that defendant knew at the time that she had failed to comply with the Act.

Finally, it was stipulated that defendant received compensation greater than $950 in connection with the grand theft counts, and less than $950 in connection with the petty theft counts.

II

FEDERAL PREEMPTION

Defendant contends that the Act is preempted by federal law. She demurred to the complaint on this ground. In any event, federal preemption can be raised for the first time on appeal. (*Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 331.)

"We apply a de novo standard of review . . . because federal preemption presents a pure question of law [citation]." (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10.)

A. *General Preemption Principles*.

"'""The supremacy clause of the United States Constitution . . . vests Congress with the power to preempt state law." [Citations.] Similarly, federal agencies, acting pursuant to authorization from Congress, can issue regulations that override state requirements. [Citations.] Preemption is foremost a question of congressional intent: did Congress, expressly or implicitly, seek to displace state law?' [Citation.]" (*Solus Industrial Innovations, LLC v. Superior Court* (2018) 4 Cal.5th 316, 331.)

Our Supreme Court has "identified several species of preemption." (*Solus Industrial Innovations, LLC v. Superior Court*, *supra*, 4 Cal.5th at p. 332.) "Express

7

preemption occurs when Congress defines the extent to which its enactments preempt state law. [Citation.] Conflict preemption is found when it is impossible to comply with both state and federal law simultaneously. [Citation.] Obstacle preemption occurs when state law stands as an obstacle to the full accomplishment and execution of congressional objectives. [Citation.] Field preemption applies when federal regulation is comprehensive and leaves no room for state regulation. [Citation.]" (*People ex rel. Harris v. Pac Anchor Transp., Inc.* (2014) 59 Cal.4th 772, 777-778.)

Ordinarily, there is a presumption against preemption. (*Solus Industrial Innovations, LLC v. Superior Court*, *supra*, 4 Cal.5th at p. 332.) "The presumption is founded on 'respect for the States as "independent sovereigns in our federal system"'; that respect requires courts 'to assume that "Congress does not cavalierly pre-empt state-law causes of action."' [Citation.] The strength of the presumption is heightened in areas where the subject matter has been the longstanding subject of state regulation in the first instance; where federal law touches 'a field that "'has been traditionally occupied by the States,'"' the party seeking to show preemption 'bear[s] the considerable burden of overcoming "the starting presumption that Congress does not intend to supplant state law."' [Citations.]" (*Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298, 313.)

Defendant argues that this presumption does not apply here, because the Act implicates foreign affairs — an area not traditionally occupied by the states. (See *Viva! International Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41

8

Cal.4th 929, 938-939 & fn. 5 [declining to decide whether presumption applies when state law "touch[es] on matters implicating foreign affairs"].)

We disagree, on the authority of *In re Jose C.* (2009) 45 Cal.4th 534. There, our Supreme Court said: "[T]he general presumption against preemption [citation] . . . applies even in the context of immigration law [citation] . . . ." (*Id.* at p. 551.)

It explained: "The '[p]ower to regulate immigration is unquestionably exclusively a federal power.' [Citations.] . . .

"While the immigration power is exclusive, it does not follow that any and all state regulations touching on aliens are preempted. [Citations.] Only if the state statute is in fact a 'regulation of immigration,' i.e., 'a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain' [citation], is preemption structural and automatic. Otherwise, the usual rules of statutory preemption analysis apply; state law will be displaced only when affirmative congressional action compels the conclusion it must be. [Citation.]" (*In re Jose C.*, *supra*, 45 Cal.4th at p. 550; see also *DeCanas v. Bica* (1976) 424 U.S. 351, 354-355.)

Here, the specification of who may provide immigration-related services, while undoubtedly a matter of federal interest and a proper subject of federal regulation, does not "regulate[] who may enter or remain in the United States." (See *In re Jose C.*, *supra*, 45 Cal.4th at p. 550.) At the same time, "[t]he states' historic police powers include the regulation of consumer protection . . . . [Citations.]" (*Gibson v. World Savings & Loan*

9

*Assn.* (2002) 103 Cal.App.4th 1291, 1300.)  Accordingly, the presumption against preemption applies fully here.[2]

        B.     *Relevant Federal Law.*

Congress has authorized the Secretary of Homeland Security to "establish such regulations . . . as he deems necessary for carrying out his authority . . . ."  (8 U.S.C. § 1103(a)(3).)  Pursuant to this authorization, the Department of Homeland Security (DHS) has adopted a set of regulations specifying who can provide representation before the United States Citizen and Immigration Services (USCIS).  (8 C.F.R. §§ 1.1, 1.2, 292.1 (2018).)[3]

Under these regulations, "representation" is defined as including both "practice" and "preparation."  (8 C.F.R. § 1.2 (2018).)

---

        **2**     We note, however, that the presumption is not crucial to our analysis; even without it, we would come to the same conclusions, for the same reasons.

        **3**     A virtually identical set of regulations specifies who can provide representation before the Executive Office for Immigration Review (EOIR).  (8 C.F.R. §§ 1001.1(c), (e), (m), 1292.1; see generally Careen Shannon, *Regulating Immigration Legal Service Providers: Inadequate Representation and Notario Fraud* (2009) 78 Fordham L. Rev. 577, 602, fn. 119.)

        Generally speaking, representation before the USCIS relates to applications for admission or continued presence, such as visas, whereas representation before the EOIR relates to removal proceedings.  (Lee, Congressional Research Service, *Legal Ethics in Immigration Matters* (2009) at p. 1, fns. omitted, available at <https://www.americanbar.org/content/dam/aba/administrative/immigration/fightnotariofraud/crs_lega_ethics_in_immigration_matters.authcheckdam.pdf>, as of May 1, 2019.)  As there is no evidence that defendant was involved in removal proceedings, we focus on representation before the USCIS.

10

"Practice" means "appearing in any case, either in person or through the preparation or filing of any brief or other document, paper, application, or petition on behalf of another person or client before or with DHS." (8 C.F.R. § 1.2 (2018).)

"Preparation," as relevant here, means "the study of the facts of a case and the applicable laws, coupled with the giving of advice and auxiliary activities, including the incidental preparation of papers . . . ." (8 C.F.R. § 1.2 (2018).) However, preparation does *not* include "service consisting solely of assistance in the completion of blank spaces on printed DHS forms, by one whose remuneration, if any, is nominal and who does not hold himself or herself out as qualified in legal matters or in immigration and naturalization procedure." (*Ibid*.)

"Case" means "any proceeding arising under any immigration or naturalization law, Executive Order, or Presidential proclamation, or preparation for or incident to such proceeding, including preliminary steps by any private person or corporation preliminary to the filing of the application or petition by which any proceeding under the jurisdiction of the Service or the Board is initiated." (8 C.F.R. § 1.2 (2018).)

In broad general outline, only five classes of people are authorized to provide "representation": (1) attorneys in good standing; (2) law students, provided they are under the supervision of an attorney and do not receive compensation; (3) "reputable individuals," who are of good moral character, provided they have a preexisting relationship with the client and do not receive compensation; (4) "accredited representatives," who have been authorized by the EOIR; and (5) "accredited officials" of

11

the client's foreign government.  (8 C.F.R. § 292.1(a), (e); see also 8 C.F.R. § 1.2 [defining attorney].)  We will refer to a member of any of these five classes as a "federally authorized person" and to a nonmember as a "federally unauthorized person."

C.  *Relevant State Law*.

The Act provides:  "It is unlawful for any person, for compensation, other than persons authorized to practice law or authorized by federal law to represent persons before the Board of Immigration Appeals or the United States Citizenship and Immigration Services, to engage in the business or act in the capacity of an immigration consultant within this state *except as provided by this chapter*."  (Bus. & Prof. Code, § 22440,  italics added.)

"A person engages in the business or acts in the capacity of an immigration consultant when that person gives nonlegal assistance or advice on an immigration matter."  (Bus. & Prof. Code, § 22441, subd. (a).)

"Immigration matter," as relevant here, means "any proceeding, filing, or action affecting the immigration or citizenship status of any person which arises under immigration and naturalization law, executive order or presidential proclamation, or action of the United States Citizenship and Immigration Services . . . ."  (Bus. & Prof. Code, § 22441, subd. (b).)

"Nonlegal assistance or advice" includes:

"(1)  Completing a form provided by a federal or state agency but not advising a person as to their answers on those forms.

12

"(2)  Translating a person's answers to questions posed in those forms.

"(3)  Securing for a person supporting documents, such as birth certificates, which may be necessary to complete those forms.

"(4)  Submitting completed forms on a person's behalf and at their request to the United States Citizenship and Immigration Services.

"(5)  Making referrals to persons who could undertake legal representation activities for a person in an immigration matter."  (Bus. & Prof. Code, § 22441, subd. (a).)

We will use "immigration consultant" as shorthand for a person who engages in the business or acts in the capacity of an immigration consultant, according to these definitions.

An immigration consultant must pass a background check (Bus. & Prof. Code, §§ 22441.1, subd. (a), 22442.4), provide clients with a written contract, in English and in the client's native language, containing specified terms (Bus. & Prof. Code, § 22442, subds. (a)-(f)), give clients 72 hours to rescind the contract (Bus. & Prof. Code, § 22442, subd. (f)), give clients signed receipts and regular account statements (Bus. & Prof. Code, § 22442.1), provide specified disclosures (Bus. & Prof. Code, §§ 22442.2, 22444, subd. (d)), maintain a client trust account (Bus. & Prof. Code, § 22442.5), follow specified document provision and retention procedures (Bus. & Prof. Code, § 22443), and file a bond (Bus. & Prof. Code, § 22443.1, subds. (a)-(d)).  A violation of the Act is subject to

13

both civil (Bus. & Prof. Code, §§ 22445, subd. (a), 22446.5) and criminal penalties. (Bus. & Prof. Code, § 22445, subds. (b)-(c).)

The Act also makes it unlawful for an immigration consultant (defined, in part, as one who gives *nonlegal* assistance or advice) to offer *legal* assistance or advice in an immigration matter. (Bus. & Prof. Code, § 22441, subd. (d).)

D.      *Interaction of Federal and State Law.*

1.      *Conflict preemption.*

Salcido asserts that acting as an "immigration consultant" under California law overlaps with "representation" under federal law. She concludes that California law permits what federal law prohibits — namely, it permits federally unauthorized persons (if they comply with California's stringent requirements) to provide "representation".

"Representation" under federal law largely involves the provision of *legal* services. By contrast, acting as an "immigration consultant" under the Act largely involves the provision of *nonlegal* services.[4] Nevertheless, we may assume, without deciding, that there are some areas of overlap. (See Moore, *Fraud, the Unauthorized*

---

[4]      At one point, we called for further briefing on whether there was sufficient evidence that defendant provided any *nonlegal* assistance or advice. The testimony at trial seemed to portray her as providing *legal* advice and assistance — for example, about the particular visa that a client might be qualified for and about how to obtain that visa. If that was all she did, it would seem that she was simply not guilty.

As the parties pointed out, however, defendant *stipulated* that she was an immigration consultant. This necessarily meant that she provided nonlegal assistance and advice (even if she also provided legal assistance and advice). Indeed, it is possible that the People refrained from presenting additional evidence that she provided nonlegal assistance and advice precisely *because* they were relying on this stipulation.

14

*Practice of Law and Unmet Needs: A Look at State Laws Regulating Immigration*

*Assistants* (2004) 19 Geo. Immig. L.J. 1, 18-19 [concluding that "preparation" includes

filling out forms by one who charges more than a nominal fee and/or holds him or herself

out as an immigration specialist, and therefore state laws permitting federally

unauthorized persons to fill out forms are preempted].)

This is essentially a conflict preemption argument. However, there is no conflict,

because it is possible to comply with both state and federal law simultaneously.

In *Hyland v. Fukuda* (9th Cir. 1978) 580 F.2d 977, Hawaiian state law prohibited a

convicted felon from possessing a firearm, but it carved out an exception for a state

employee acting in the course of his or her duties. (*Id*. at p. 980.) Federal law, however,

flatly prohibited a convicted felon from possessing a firearm under any circumstances.

(*Id*. at pp. 979-980.) The appellate court held that this raised no preemption issue,

because the state law merely "determines the legality of a certain act under state law, it

has no impact on the legality of the same act under federal law. Simply put, Congress

has chosen to prohibit an act which Hawaii has chosen not to prohibit . . . ." (*Id*. at

p. 981.)

Similarly, in *Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th

734, state law generally prohibited the possession, sale, and transportation of marijuana,

but it created an exemption, under certain circumstances, when the marijuana was for

medical purposes. (*Id*. at pp. 742-746.) Federal law, however, flatly prohibited the

possession of marijuana, even if for medical purposes. (*Id*. at pp. 756-757.)

The appellate court held that there was no conflict preemption: "Conflict preemption exists when 'simultaneous compliance with both state and federal directives is impossible.' [Citation.] . . . A claim of positive conflict might gain more traction if the state *required*, instead of merely exempting from state criminal prosecution, individuals to possess, cultivate, transport, possess for sale, or sell medical marijuana in a manner that violated federal law. But because [state law does not] require such conduct, there is no 'positive conflict' with federal law . . . . [Citation.] In short, nothing in either state enactment purports to make it impossible to comply simultaneously with both federal and state law." (*Qualified Patients Assn. v. City of Anaheim*, *supra*, 187 Cal.App.4th at pp. 758-759.)

Here, California state law does not say that a person who has complied with all of the requirements of the Act *can* fill out forms (which arguably constitutes "representation," at least in some circumstances). Rather, it says that a person who has *not* complied with all of the requirements of the Act *cannot* fill out forms. Thus, the Act does not purport to allow anyone to violate federal law. A person still must be federally authorized in order to provide any kind of "representation."

We accept that a state cannot penalize a nonlawyer who represents a client before a federal agency for the unauthorized practice of law, when the representation is authorized by federal law. (*Sperry v. Florida* (1963) 373 U.S. 379, 385.) Here, however, the state seeks to penalize a nonlawyer for acts that, even if they were "representation," were *not* authorized by federal law.

16

There is no conflict, and thus there is no conflict preemption.

        2.      *Obstacle preemption.*

Defendant notes that the DHS has prescribed certain disciplinary penalties for "the unauthorized representation of immigrants"; however, these do not include criminal penalties. She argues that this reflects a federal choice not to make unauthorized representation a crime, and therefore the Act is preempted. This is essentially an obstacle preemption argument.

The flaw in this argument is that federal law provides disciplinary penalties only against federally authorized persons, and not against federally unauthorized persons. It leaves any penalties against the latter up to the states.

"An adjudicating official or the Board of Immigration Appeals . . . may impose disciplinary sanctions against any practitioner . . . ." (8 C.F.R. § 292.3(a)(1).) A "practitioner," however, is defined as either an attorney or a federally authorized person. (8 C.F.R. §§ 1.2, 292.3(a)(2); see also 8 C.F.R. § 292.3(a)(1) [providing for sanctions against "a practitioner who is authorized to practice before DHS"].) Thus, the listed grounds for discipline, while not exclusive, do not include representation by a federally unauthorized person. (8 C.F.R. § 292.3(b), incorporating 8 C.F.R. § 1003.102.) The omission is highlighted by the fact that they *do* include *assisting* representation by a federally unauthorized person. (8 C.F.R. § 292.3(b), incorporating 8 C.F.R. § 1003.102(m).)

17

In 1992, a legal opinion of the Office of the General Counsel of the former Immigration and Naturalization Service (the predecessor of the USCIS) concluded that a state can penalize a federally unauthorized person for engaging in the unauthorized practice of law. (Office of the General Counsel Opn. No. 92-29, Legal Opinion: Role of Visa Consultants in the Practice of Immigration Law (June 9, 1992) 1992 WL 1369368 at p. *2.) It added: "Whether or not representation by . . . a [federally unauthorized] person in violation of federal immigration regulations also violates state laws can only be determined by applying the statutes and regulations that govern the practice of law in each particular state." (*Id*. at p. *4.)

Consistent with our analysis, the EOIR's Immigration Court Practice Manual states that its "disciplinary procedures . . . do not apply to non-practitioners engaged in the unauthorized practice of law. Anyone harmed by an individual practicing law without authorization should contact the appropriate law enforcement or consumer protection agency." (EOIR, Immigration Court Practice Manual (rev. Aug. 2, 2018) § 10.3(e).[5]) The manual also states: "Immigration specialists — who include visa consultants and 'notarios' — are not authorized to practice law or appear before the

---

[5] Available at <https://www.justice.gov/eoir/page/file/1084851/download>, as of May 1, 2019.

18

Immigration Court. These individuals may be violating the law by practicing law without a license." (*Id.*, § 2.7.) This is necessarily a reference to *state* law.[6]

Defendant also points to the EOIR's Fraud and Abuse Prevention Program. (See <https://www.justice.gov/eoir/fraud-and-abuse-prevention-program>, as of May 1, 2019.) "The Fraud Program investigates complaints of fraud, scams, and unauthorized practitioners . . . ." (*Ibid.*) However, it also "supports fraud and unauthorized practitioner investigations, prosecutions, and disciplinary proceedings initiated by local [and] state . . . law enforcement and disciplinary authorities." (*Ibid.*) Its website includes a link entitled, "How Do I Report a Scam or an Unauthorized Practitioner to State or Local Officials?" (*ibid.*); when clicked, on it leads to a page indicating that "the unauthorized practice of immigration law" in California is governed by the "Immigration Consultants Act" and should be reported to the state Attorney General or the State Bar. (Report Immigration Scams, <https://www.uscis.gov/avoid-scams/report-scams>, as of May 1, 2019.)

In sum, then, there is a clear federal intent to allow the states to penalize federally unauthorized persons for providing "representation" in immigration matters. And, of course, to the extent that what defendant was doing was *not* "representation," as defined by federal law, there was no federal concern whatsoever about state regulation of her conduct.

---

[6] The EOIR's Board of Immigration Appeals Practice Manual (rev. Oct. 16, 2018), available at <https://www.justice.gov/eoir/page/file/1103051/download>, as of May 1, 2019, contains virtually identical provisions. (*Id.*, §§ 2.7, 11.3(a))

3.     *Field preemption.*

Although defendant mentions field preemption, we do not understand her to be relying on it. All of her arguments turn on the state law being in conflict with, or an obstacle to the accomplishment of the intention of, federal law. If only out of an excess of caution, then, we note that, for the reasons already stated, field preemption also does not apply. The federal regulation is not so comprehensive as to leave no room for state regulation; while it specifies who may (and may not) provide representation before the USCIS, it offers only an incomplete enforcement mechanism. Moreover, there are ample indicia of a federal intent to allow for state regulation.

## III

## THE SUFFICIENCY OF THE EVIDENCE OF THEFT BY FALSE PRETENSES

Defendant contends that there was insufficient evidence, with respect to (1) reliance by her clients and (2) fraudulent intent, to support her theft convictions.

A.     *General Legal Principles.*

"In addressing a claim of insufficient evidence to support a conviction, this court "'reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.'" [Citation.] 'We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply

because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.]" (*People v. Jackson* (2016) 1 Cal.5th 269, 345.) "[T]he relevant inquiry on appeal is whether, in light of all the evidence, '*any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)

In California, the statutory crime of theft can be committed under three distinct theories: (1) larceny, (2) embezzlement, and (3) obtaining property by false pretenses. (*People v. Gonzales* (2017) 2 Cal.5th 858, 864-866.) Defendant did not commit larceny, because she took her clients' money with their consent. (See *id*. at p. 864.) She did not commit embezzlement, because she did not misappropriate money that she lawfully possessed. (*Ibid*.) Rather, the trial court found her guilty on a theory of theft by false pretenses.

"[T]heft by false pretenses . . . requires . . . that '(1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation.' [Citation.]" (*People v. Williams* (2013) 57 Cal.4th 776, 787, italics omitted.) Here, the trial court found that defendant made a false representation "by holding herself out as an immigration consultant when she was not qualified to be an immigration consultant." It further found that she knew she was not qualified to be an immigration consultant, and she had the specific intent to obtain money from her clients by deceiving them. Finally, it found that each of the victims "paid

21

money to defendant . . . in reliance upon defendant's representations. . . that she was an immigration consultant." Defendant challenges the latter two findings.

B.     *Reliance*.

"'"'[T]he express testimony of a victim of false pretense that he was induced to part with his money by the fraudulent statements of the accused is not essential. It is sufficient if the inference of his reliance could have been drawn from all the evidence.'" [Citations.]" (*Perry v. Superior Court of Los Angeles County* (1962) 57 Cal.2d 276, 285-286.)

For example, in *People v. Frankfort* (1952) 114 Cal.App.2d 680, the defendants sold parcels of real property, which came with membership in a country club, to various buyers (*id.* at pp. 686-687, 689-691); in the course of doing so, they made false representations about such matters as financing, maintenance fees, the supply of mineral water, and their plans to build a health resort. (*Id.* at pp. 691-692.) Some but not all of the buyers testified that they relied on the misrepresentations. Nevertheless, the appellate court held that the trial court could justifiably infer reliance. (*Id.* at p. 699.) It reversed the convictions on only two counts, in connection with which the particular victim affirmatively testified that he or she did *not* rely. (*Ibid.*)

Here, likewise, the trial court could infer reliance. Defendant agreed to provide specific immigration services to each of the victims; in return, the victims agreed to pay her hundreds or thousands of dollars. Most of the victims met with her at her office, where she had signs advertising her immigration services. Some of the victims had also

22

seen ads stating that she provided immigration services.  The conclusion is not only reasonable but compelling that, if the victims had known that she could not legally provide the immigration services that she promised, they would not have paid her.

C.    *Fraudulent Intent.*

The trial court could also reasonably find fraudulent intent.  When an investigator questioned defendant, she admitted knowing that she was required to have a background check and to post a bond, but she had not done so.

In her training to become a paralegal, defendant had studied immigration law.  She also researched immigration law at the library, online, and by talking to immigration officers.  At the preliminary hearing, she testified:

"Q. . . .  [Y]ou're aware that the State of California requires you to pass a background check, right?

"A.  I didn't know about that until 2015.

"Q.  And you're aware that you're also required to have a $100,000 bond on file; correct?  [¶] . . .

"[A.]  Yes, I read about that.

"Q. . . .  You did know that?

"A.  Yes."

Because she carefully specified when she learned about the background check requirement, but she did not specify when she learned about the bond requirement, it is fairly inferable that she knew about the bond requirement at all relevant times.

23

At trial, she claimed that she did not learn that she needed a bond until September or November 2013. However, this was contradicted by the fact that she apparently did not tell the investigator this.  It was further contradicted by her claim at the preliminary hearing that she supposedly did not learn about the background check requirement until 2015.

Defendant nevertheless argues that she did not have fraudulent intent because she could actually do the work that she promised to do for her clients — "the evidence was she assisted many people over many years to legally obtain valid green cards, visas, citizenship etc."  The People's response is apt:  "Appellant's ability to evade law enforcement prior to the instant case is immaterial . . . ."  She may have hoped to get away with acting as an immigration consultant, but at the same time, she knew she might not.  However, she did not share this fact with her clients.  As a matter of fact, once defendant was arrested, she was unable to complete her open cases.

IV

ELECTRONIC SEARCH CONDITION OF PROBATION

Probation condition 39 requires defendant to "[s]ubmit to immediate search and seizure of computers, memory storage devices, electronic mail, internet accounts, and data and information contained therein; with or without reasonable cause by the probation

officer or law enforcement." Defendant contends that this condition is unreasonable and unconstitutional.[7]

A. *Forfeiture*.

Preliminarily, the People contend that defendant forfeited this contention by failing to object at sentencing.

"As a rule, failure to object to a probation condition in the trial court on standard state law or reasonableness grounds forfeits the claim for appeal. [Citation.]" (*People v. Moran* (2016) 1 Cal.5th 398, 405, fn. 7.) Defendant argues, however, that if so, her trial counsel's failure to object constituted ineffective assistance of counsel. We exercise our discretion to decide the issue on the merits to obviate the need to address her alternative ineffective assistance of counsel claim. (*In re Victor L.* (2010) 182 Cal.App.4th 902, 928.)

B. *Reasonableness*.[8]

"Consistent with established law, we first address whether the probation condition was permissible under state law before turning to resolve any potential federal constitutional issue posed in the case." (*People v. Moran*, *supra*, 1 Cal.5th at pp. 401-402, fn. omitted.)

---

[7]     In her opening brief, defendant similarly challenged probation conditions 37 and 38, which also related to electronic data. As she now concedes, however, the trial court did not actually impose these conditions.

[8]     The question of whether an electronic search condition is unreasonable under state law is currently pending before the Supreme Court in *In re Ricardo P.* (2015) 241 Cal.App.4th 676, review granted Feb. 17, 2016, S230923.

A probation condition is unreasonable if it "'"(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . ."'" [Citation.]" (*People v. Anderson* (2010) 50 Cal.4th 19, 32.)

"On appeal, '[w]e review conditions of probation for abuse of discretion.' [Citation.] That is, a reviewing court will disturb the trial court's decision to impose a particular condition of probation only if, under all the circumstances, that choice is arbitrary and capricious and is wholly unreasonable. [Citation.]" (*People v. Moran*, *supra*, 1 Cal.5th at p. 403.)

There is no evidence that defendant's crimes involved computers or the internet.[9] And using computers or the internet is not, in itself, criminal. Accordingly, the key question is whether this condition relates to future criminality.

"'A condition of probation that enables a probation officer to supervise his or her charges effectively is, therefore, 'reasonably related to future criminality.' [Citations.]" (*People v. Olguin* (2008) 45 Cal.4th 375, 380-381.)

"'[P]robation conditions authorizing searches 'aid in deterring further offenses . . . and in monitoring compliance with the terms of probation. [Citations.] By allowing close supervision of probationers, probation search conditions serve to promote rehabilitation and reduce recidivism while helping to protect the community from

---

[9] The police seized computers from defendant but never actually searched them. According to the probation report, defendant obtained clients through television, radio, magazine, and newspaper ads.

26

potential harm by probationers.' [Citation.]" (*People v. Olguin*, *supra*, 45 Cal.4th at p. 380.) In particular, "a warrantless search condition is intended to ensure that the subject thereof is obeying the fundamental condition of all grants of probation, that is, the usual requirement (as here) that a probationer 'obey all laws.'" (*People v. Balestra* (1999) 76 Cal.App.4th 57, 67.)

In this respect, we see no relevant difference between an electronic search condition and any other search condition. We recognize that a computer (or similar memory storage device) is qualitatively different from the home or the person, because it makes some information available that was unavailable before — e.g., a list of person's Google searches. (See *Riley v. California* (2014) ___ U.S. ___, ___ [134 S.Ct. 2473, 2491].) At the same time, however, it makes new crimes possible that were impossible before, such as ransomware installation, and it facilitates existing crimes, such as identity theft. Therefore, an electronic search condition is reasonably related to supervising a probationer's rehabilitation and compliance with the law. (*In re P.O.* (2016) 246 Cal.App.4th 288, 295-296.)

Defendant relies on *In re Erica R.* (2015) 240 Cal.App.4th 907, which held an electronic search condition invalid as applied to a juvenile who had committed possession of Ecstasy. (*Id.* at pp. 911-915.) The court, however, distinguished a case upholding a general search condition, on the ground that it "involved an adult probationer, not a juvenile probationer . . . . Courts have recognized that a 'minor cannot be made subject to an automatic search condition; instead, such condition must be tailored to fit the

27

circumstances of the case and the minor.'  [Citations.]"  (*Id*. at p. 914.)  Thus, it implied that an electronic search condition, as applied to an adult, would have to be upheld.

In a footnote, defendant also challenges a separate probation condition that requires her to "[d]isclose your true identity, including residence address and telephone number, in any advertisement, notice, or offer to sale and/or purchase on the internet." We deem this contention forfeited, because it is not within the scope of any of the headings in her brief, and because it is not supported by any analysis or citation of authority.  (Cal. Rules of Court, rule 8.204(a)(1)(B); *People v. Nguyen* (2013) 212 Cal.App.4th 1311, 1325.)  However, we do note that, assuming this condition was valid, the challenged electronic search condition was necessary to monitor defendant's compliance with it.

We therefore conclude that the challenged search condition was reasonable as a matter of state law.

C.    *Constitutionality*.

"If a probation condition serves to rehabilitate and protect public safety, the condition may 'impinge upon a constitutional right otherwise enjoyed by the probationer, who is "not entitled to the same degree of constitutional protection as other citizens."'  [Citation.]"  (*People v. O'Neil* (2008) 165 Cal.App.4th 1351, 1355.)

Nevertheless, "'"[a] probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad." [Citation.]  "The essential

28

question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights — bearing in mind, of course, that perfection in such matters is impossible, and that practical necessity will justify some infringement." [Citation.]' [Citations.]" (*People v. Guzman* (2018) 23 Cal.App.5th 53, 64.)

"We review 'constitutional challenges to probation conditions de novo.' [Citation.]" (*People v. Guzman*, *supra*, 23 Cal.App.5th at p. 64.)

### 1.     *Self-incrimination*.

Defendant contends that the challenged condition implicitly requires her to disclose her passwords, and hence it requires her to incriminate herself.

"[I]t would raise serious constitutional questions to require defendants to waive their privilege against self-incrimination as a condition of probation." (*People v. Garcia* (2017) 2 Cal.5th 792, 803.)  However, "a [s]tate may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination." (*Minnesota v. Murphy* (1984) 465 U.S. 420, 435, fn. 7.)

The California Supreme Court's decision in *People v. Garcia*, *supra*, 2 Cal.5th 792 is all but on point.  There, the defendant was convicted of sex offenses and placed on probation.  (*Id*. at p. 799.)  As required by Penal Code section 1203.067, subdivision

29

(b)(3), the trial court made it a condition of probation that he had to waive the privilege against self-incrimination and submit to polygraph examinations. (*Ibid*.)

The Supreme Court held that, in order to avoid any constitutional question, the probation condition had to be construed to mean that "a probationer is required to answer the questions posed by the containment team, on pain of probation revocation should the probationer refuse. In turn, the probationer's compelled responses may not be used against the probationer in a subsequent criminal prosecution. [Citation.]" (*People v. Garcia*, *supra*, 2 Cal.5th at p. 807.) It then upheld the constitutionality of the condition, as so construed: "As this court has previously explained, the Fifth Amendment does not establish a privilege against the compelled disclosure of information; rather, it 'precludes the use of such evidence in a criminal prosecution against the person from whom it was compelled.' [Citation.]" (*Ibid*.)

Defendant relies on *United States v. Kirschner* (E.D. Mich. 2010) 823 F.Supp.2d 665. There, however, the prosecution subpoenaed the defendant to testify before a grand jury; the subpoena required him to disclose computer passwords. (*Id*. at p. 666.) Thus, there was no question that the government was seeking to compel the disclosure of the passwords for use as evidence in a criminal prosecution. *Kirschner* does not apply when (1) the government is seeking to compel the disclosure of passwords for purposes of probation supervision, and (2) the defendant can still prevent their use in evidence.

Accordingly, if and to the extent that the challenged condition requires defendant to disclose passwords, it does not preclude her from invoking her right against self-

incrimination, after such a disclosure, to preclude the use of the disclosure against her in a criminal prosecution. The condition, as thus construed, does not violate that constitutional right.

2. *Other constitutional rights*.

Defendant also contends that the challenged condition violates her First Amendment, Fourth Amendment, and privacy rights.

The Supreme Court has granted review in a number of recently published cases involving this issue. (E.g., *People v. Maldonado* (2018) 22 Cal.App.5th 138 [electronic search condition not overbroad], review granted June 20, 2018, S248800; *People v. Valdivia* (2017) 16 Cal.App.5th 1130 [electronic search condition overbroad], review granted Feb. 14, 2018, S245893.) The grants of review, however, were limited to the issue of reasonableness under state law, not constitutional overbreadth. Thus, the Supreme Court is not likely to decide the present issue. Moreover, while these cases are citable (Cal. Rules of Court, rule 8.1115(e)(1)), they are in conflict; they do not point in any clear direction. Hence, we analyze the issue afresh.

As discussed in part IV.B, *ante*, we see no relevant difference between an electronic search condition and any other search condition. Once again, defendant relies on *Riley v. California*, *supra*, 134 S.Ct. 2473, which held that a search of an arrestee's cell phone requires a warrant. In the course of doing so, the court observed that "[c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person" (*id*. at p. 2489), so that a search of cell phone data is

31

more intrusive and more violative of privacy than a conventional search incident to arrest. (*Id.* at pp. 2489-2491.)  The court cautioned, however:  "Our holding, of course, is not that the information on a cell phone is immune from search . . . ."  (*Id.* at p. 2493.)  "[E]ven though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone."  (*Id.* at p. 2494.)

Defendant, as a probationer, is in a materially different position that the arrestee in *Riley*.  She has been tried and found guilty of crimes.  As a result, she has a lesser expectation of privacy.  "Inherent in the very nature of probation is that probationers 'do not enjoy "the absolute liberty to which every citizen is entitled."'  [Citation.]  Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens."  (*United States v. Knights* (2001) 534 U.S. 112, 119.)  As already discussed, the unique qualities of cell phones (and similar electronic devices) may make a search more intrusive; however, they also open up new avenues to crime and necessitate new methods of supervision.

Significantly, defendant does not suggest how the challenged condition could be made narrower and yet still be effective.[10]  She argues that "the condition[] intrude[s]

_____

[10]    At oral argument, defendant's counsel suggested that the search condition could be limited to defendant's business-related files.  But how is a probation officer to know which files are business-related without searching them?  And for obvious reasons, it cannot be left up to defendant to designate which of her files are business-related.

broadly and indiscriminately on the most intimate details of [her] private life — her movement, associations, political and religious beliefs, and her personal, romantic, and sexual expression and thought. The condition[] chill[s] her ability to have frank and open conversations with partners, friends, family members, and acquaintances." However, due to her counsel's failure to object below, as well as the resulting failure to develop an evidentiary record, we can only consider the impact of the challenged electronic search condition on its face; we cannot consider any particularized impact it may have on defendant. In any event, defendant's concerns are overblown, given that a probation search "must be reasonably related to the purposes of probation" (*People v. Robles* (2000) 23 Cal.4th 789, 797) and not harassing, arbitrary, or capricious. (*People v. Bravo* (1987) 43 Cal.3d 600, 610.)

*In re P.O.*, *supra*, 246 Cal.App.4th at pp. 297-298 and *In re Malik J.* (2015) 240 Cal.App.4th 896, 901-904 held that, at least in most cases, an electronic search condition is overbroad. These cases are distinguishable, however, because they involved juveniles. Unlike an adult, "a minor cannot be made subject to an automatic search condition; instead, such condition must be tailored to fit the circumstances of the case and the minor. [Citations.]" (*People v. Rios* (2011) 193 Cal.App.4th 584, 597.)

In addition, *People v. Appleton* (2016) 245 Cal.App.4th 717 held an electronic search condition overbroad in the case of an adult. (*Id.* at pp. 724-727.) However, we respectfully disagree with the reasoning in *Appleton*.

First, the court rejected the analogy to a general search condition, reasoning that the cases upholding a general search condition had not been decided in the context of the original imposition of the condition at sentencing, but rather in the context of a challenge to the resulting search. (*People v. Appleton*, *supra*, 245 Cal.App.4th at pp. 724-725.) While that may be true of the cases that *Appleton* cited, this court has upheld a general search condition in the context of the original imposition of the condition at sentencing. (*People v. Adams* (1990) 224 Cal.App.3d 705, 711-712.) We noted that "a warrantless search condition is intended [to] and does enable a probation officer '"to ascertain whether [the defendant] is complying with the terms of probation; to determine not only whether [the defendant] disobeys the law, but also whether he obeys the law. Information obtained . . . would afford a valuable measure of the effectiveness of the supervision given the defendant and his amenability to rehabilitation."' [Citation.]" (*Id.* at p. 712.)[11]

Second, *Appleton* reasoned, citing *Riley*, that an electronic search condition is more "invasive" than a general search condition. (*People v. Appleton*, *supra*, 245 Cal.App.4th at p. 725.) For the reasons already stated, we do not find *Riley* particularly relevant to the validity of a probation condition.

---

[11] Our Supreme Court has similarly endorsed the effectiveness of a general search condition: "[P]robation conditions authorizing searches 'aid in deterring further offenses . . . and in monitoring compliance with the terms of probation. [Citations.] By allowing close supervision of probationers, probation search conditions serve to promote rehabilitation and reduce recidivism while helping to protect the community from potential harm by probationers.' [Citation.]" (*People v. Olguin*, *supra*, 45 Cal.4th at p. 380.)

34

We look instead to *People v. Ebertowski* (2014) 228 Cal.App.4th 1170, which, while not perfectly on point, is persuasive. It held that probation conditions requiring the defendant to provide the passwords to his electronic devices and social media accounts were not overbroad so as to unduly impinge on his constitutional rights to privacy, speech, and association (*id*. at pp. 1175-1176): "'Defendant's constitutional privacy rights are not improperly abridged by the password conditions any more than they are by the search condition. Even where there is '(1) a legally protected privacy interest; (2) a reasonable expectation of privacy under the circumstances; and (3) conduct constituting a serious invasion of the privacy interest,' the constitutional right to privacy is not violated if 'the invasion of the privacy interest is justified because it substantially furthers one or more legitimate competing or countervailing privacy or non-privacy interests.' [Citation.] Here, the competing interest is the state's interest in preventing defendant from continuing his violent gang associations and activities. . . . The minimal invasion of his privacy that is involved in the probation officer monitoring defendant's use of his devices and his social media accounts while defendant is on probation is outweighed by the state's interest in protecting the public from a dangerous criminal who has been granted the privilege of probation." (*Id*. at p. 1176, fn. omitted.)

Defendant may not be a violent gang member, but she is a convicted thief who victimized eight people (or more, if you include the counts that were dismissed as time-barred) by taking money that they could ill afford to lose. The state has the same interest in monitoring her probation as it had in monitoring Ebertkowski's — namely, promoting

35

the defendant's rehabilitation while protecting the public.  The challenged electronic

search condition serves this purpose.  Defendant has not shown that a narrower search

condition would do the same.

V

DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
P. J.


I concur:

McKINSTER
J.

36

RAPHAEL, J., Concurring and Dissenting.

Can the State subject a probationer whose crime did not involve computers or the internet to warrantless, suspicionless searches of her cell phone and other electronic storage devices?  Because United States Supreme Court precedent suggests that the Fourth Amendment requires reasonable suspicion for such searches, I dissent from Section IV of today's opinion.  I join the other sections.

I.

The majority recognizes that "[t]here is no evidence that defendant's crimes involved computers or the internet."  (Maj. opn., *ante*, at p. 26.)  Nevertheless, the majority permits probation condition 39, which authorizes warrantless, suspicionless searches for digital information on defendant's cell phone or other electronic storage devices whenever requested by a probation officer or law enforcement.  (Maj. opn. *ante*, at pp. 24-36.)

In general, "[a] probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad."  (*In re Sheena K.* (2007) 40 Cal.4th 875, 890; see *People v. Garcia* (1993) 19 Cal.App.4th 97, 101-102 ["Where a condition of probation requires a waiver of constitutional rights, the condition must be narrowly drawn."].)

The United States Supreme Court is the final arbiter of the scope of the rights under the Fourth Amendment to the United States Constitution.  Three aspects of its case

1

law, taken together, persuade me that the Fourth Amendment requires reasonable suspicion for a blanket condition authorizing electronic searches of a probationer's digital devices, at least where the probationer's crime did not involve computers or the internet. These are (1) the special protection afforded an individual's digital data, (2) the Court's application of the reasonable suspicion standard to probation searches, and (3) the Court's confirmation that probationers retain Fourth Amendment rights. Considering these together, I conclude that the condition authorizing suspicionless searches of defendant Sara Salcido's digital evidence is not narrowly drawn.

A.

First, in a landmark opinion interpreting the Fourth Amendment, the Supreme Court held that digital evidence from a cell phone receives categorically greater constitutional protection than does ordinary physical evidence. In *Riley v. California* (2014) 573 U.S. 373 (*Riley*), the Court established that "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." (*Riley*, *supra*, at p. 393; *see id.* ["[c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person. . . . . . . [M]any of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers."].)

Whereas the interior of a citizen's home has long been the "prototyptical" area of Fourth Amendment protection (*Kyllo v. United States* (2001) 533 U.S. 27, 34), the Court in *Riley* observed that "a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house . . . ." (*Riley*, *supra*, 571 U.S. at p. 396.) Consequently, the court held that cell phones were an exception to the general rule that property on an arrestee's person may be searched incident to arrest without suspicion. That is, as to the digital evidence on a cell phone, the Supreme Court held that the search-incident-to-arrest exception to the warrant requirement does not apply. Before police can search a cell phone on an arrestee's person, they must "get a warrant." (*Id.* at p. 403.)

Today's majority "see[s] no relevant difference between an electronic search condition and any other search condition." (Maj. opn., *ante*, at p. 27.) This is a misunderstanding of *Riley*'s central point: an electronic search condition is *far* more invasive to a subject's privacy than a search of an ordinary object. To be sure, a court may consider the invasiveness of a suspicionless electronic search and determine that the invasion is permissible in a particular context. But we must take seriously *Riley*'s special treatment of electronic search conditions. After *Riley*, I believe that a court cannot simply dismiss an electronic search condition as no different than other search conditions.

After recognizing *Riley*'s holding that electronic search conditions are particularly invasive, we must carefully consider whether it is the case that, as the majority concludes, defendant Sara Salcido "as a probationer, is in a materially different position than the arrestee in *Riley*." (Maj. opn., *ante*, at p. 32.) Both a probationer and an arrestee have

3

diminished Fourth Amendment interests.  That is, *Riley* rejected a suspicionless search of

an arrestee's phone even though an arrestee has "reduced privacy interests upon being

taken into police custody."  (*Riley*, *supra*, 573 U.S. at p. 391.)  The Court nevertheless

held that those "diminished privacy interests" did not mean "that the Fourth Amendment

falls out of the picture entirely."  (*Id.* at p. 392.)  Like arrestees, probationers have lesser

expectation of privacy than do other citizens, but it does not necessarily follow that the

Fourth Amendment vanishes as to them.  *Riley*'s heightened protection for digital

searches may apply differently in different contexts, yet it still must be considered in each

context rather than simply dismissing *Riley* as only a search-incident-to-arrest case.  (See,

e.g., *Carpenter v. United States* (2018) 138 S. Ct. 2206, 2219-2220 [citing *Riley* in

holding that the Fourth Amendment requires a warrant for the government to acquire a

suspect's cell phone site information from third parties, despite no such requirement for

standard business records]; *United States v. Kolsuz* (4th Cir. 2018) 890 F.3d 133, 144

[though routine border searches do not require suspicion, *Riley* requires that a border

search of a cell phone is "permissible only on a showing of individualized suspicion"].)[1]

---

[1] The majority relies on *Riley*'s statement that there may be "case-specific
exceptions [that] justify a warrantless search of a particular phone" (*Riley*, *supra*, 573
U.S. at pp. 401-402; see maj. opn., *ante*, at p. 33).  That statement in *Riley* refers to
exigencies such as a "fleeing suspect" (*Riley*, *supra*, at p. 402) and does not apply to our
consideration of whether a blanket suspicionless search condition of a probationer's
electronic data is permissible.  That is, the condition in this case is not a "case-specific
exception" but a complete authorization to examine without limitation any electronic
record, and an authorization that the prosecution apparently believes it could seek for any
probationer.  On a different record than this one, the Supreme Court's "case-specific
exception" language and analysis may allow a suspicionless electronic search condition
that is tailored to a particular defendant based on his or her crime or history.

The second important aspect of Supreme Court law is that the Court has never upheld a probation search or condition that permits authorities to search without any suspicion or cause. Rather, when it has upheld probation searches, the Court has relied on the fact that they have been supported by reasonable suspicion. (*Griffin v. Wisconsin* (1987) 483 U.S. 868, 876 [upholding probation search where "the special needs of Wisconsin's probation system make the warrant requirement impracticable and justify replacement of the standard of probable cause by 'reasonable grounds' as defined by the Wisconsin Supreme Court"]; *United States v. Knights* (2001) 534 U.S. 112, 121 & fn. 6 (*Knights*) [holding that "no more than reasonable suspicion" of criminal activity is required to search particular probationer's house and not reaching constitutionality of suspicionless search].) It is one thing to hold that probationers lose the protections of the Fourth Amendment's warrant and probable cause requirements; it is a further step to hold that—based solely on the fact that they are probationers—they may be subject to searches absent any suspicion. The Supreme Court has thus far not authorized that step in any context, much less with regard to digital evidence that it specially protected in *Riley*.

Finally, when the Supreme Court upheld a *suspicionless* search of a cigarette box in a parolee's pocket in *Samson v. California* (2006) 547 U.S. 843 (*Samson*), it relied on a distinction between probation and parole. The Court held that on the "continuum" of state-imposed punishments, "parolees have fewer expectations of privacy than probationers." (*Id.* at 850.) Parole is additional punishment for a defendant who

5

warranted incarceration making it "more akin to imprisonment than probation is to imprisonment." (*Ibid.*)

*Samson* thereby suggested, without deciding, that a suspicionless search of even an ordinary object carried by a probationer, rather than a parolee, might not be permissible. That question is not at issue here, because this case presents yet a deeper intrusion into a probationer's Fourth Amendment rights, as the majority today holds that a suspicionless search of the contents of a probationer's *digital storage devices* is permissible as a blanket matter. Such data receives heightened protection under *Riley*. If every probationer can be made subject to such suspicionless searches for digital evidence on their cell phones and home computers, it is hard to see what would remain of the greater protection on the Fourth Amendment "continuum" that *Samson* afforded probationers. Consequently, it seems to me that current Supreme Court precedent indicates that probation condition 39 is unconstitutionally overbroad under the Fourth Amendment, insofar as it authorizes suspicionless searches rather than those based on reasonable suspicion.

B.

We are not bound by the constitutional law applied by federal courts of appeals, yet those courts also persuasively support the conclusion that the Fourth Amendment requires reasonable suspicion for a blanket digital search condition of a probationer.

Under federal law, "warrantless, suspicionless search conditions . . . should not be routinely imposed." (*United States v. Cervantes* (9th Cir. 2017) 859 F.3d 1175, 1184.)

6

They may be imposed where particular facts justify the suspicionless search condition. (*Ibid.*) Accordingly, federal statutes do not contain a generally applicable condition authorizing suspicionless searches of federal probationers. (See 18 U.S.C. § 3563; 18 U.S.C. § 3583 [supervised release].)

There is, however, one way to see how the federal appellate courts may approach a probation condition authorizing suspicionless digital searches. For federal sex offenders only, the United States Code contains a discretionary probation condition requiring that the defendant submit his person and property, including electronics, to a search at any time by law enforcement or probation officers. (See 18 U.S.C. § 3563(b)(23); 18 U.S.C. § 3583(d)(3) [supervised release].) That search condition, however, contains a reasonable suspicion requirement. (*Ibid.*)

When federal appellate courts across the nation have approved the imposition of the sex-offender electronic search condition post-*Riley*, they have expressly relied on the requirement of reasonable suspicion. (*United States v. Winston* (8th Cir. 2017) 850 F.3d 377, 382 ["The search condition also is not excessive . . . because it is limited to searches conducted in a reasonable manner at a reasonable time and only upon reasonable suspicion."]; *United States v. Parisi* (2d Cir. 2016) 821 F.3d 343, 348 ["the new search condition includes an outside constraint—Probation Services must have a reasonable suspicion that Parisi has violated a condition of his release or engaged in unlawful conduct before it engages in a search"]; *United States v. Winding* (5th Cir. 2016) 817 F.3d 910, 917 ["A warrantless search of Winding's electronic devices is permitted only

7

'upon reasonable suspicion' of lawbreaking, thereby subjecting Winding at most to intermittent searches (and perhaps none at all if there is never reasonable suspicion)"]; *United States v. Kappes* (7th Cir. 2015) 782 F.3d 828, 862 [relying on understanding that digital search "may *only* be done if the probation officer has reasonable suspicion to believe that Jurgens is in violation of a condition of supervised release"].)

Furthermore, in a post-*Riley* federal case, the Ninth Circuit Court of Appeals invalidated a suspicionless search of a California probationer's cell phone. (*United States v. Lara* (9th Cir. 2016) 815 F.3d 605, 612.) In balancing the probationer's privacy interests against the government's interests, that court considered the principles articulated in *Knights*, *Samson*, and *Riley*. (*United States v. Lara*, *supra*, at pp. 610-612.) On the particular facts, the court held that that although the defendant's Fourth Amendment privacy interest was "somewhat diminished," the interest "was nonetheless sufficiently substantial to protect him from the two cell phone searches at issue here." (*Id.* at p. 612.) Although *Lara* involved a challenge to a particular search rather than a blanket condition, the fact that the search was held unconstitutional counsels against approving *carte blanche* to search, rather than requiring conditions tailored to a defendant's crimes or requiring reasonable suspicion.[2]

---

[2] The majority mixes the question of the reasonableness of the *scope* of a valid computer search with the question of whether a search is reasonable in the first place. (Maj. opn., *ante*, at p. 32, fn. 10.) As to the execution of search warrants for computers, cases have held warrants overbroad if they lack an affidavit presenting a "reasonable explanation" for the *extent* of the seizure of data. (See *United States v. Hill* (9th Cir. 2006) 459 F.3d 966, 975-977 [discussing cases].) Likewise, if a law enforcement officer has reasonable suspicion that particular evidence might be found on a probationer's

In my view, this federal appellate case authority supports the conclusion that blanket probation conditions authorizing suspicionless digital searches are unreasonable under the Fourth Amendment, at least where the probationer's offense does not involve the use of the internet or computers.

C.

Our Court of Appeal's case law is split as to the constitutionality of probation conditions that authorize digital searches. Because of the United States Supreme Court law discussed above, I would follow those authorities that find such conditions overbroad. (See *People v. Valdivia* (2017) 16 Cal.App.5th 1130, 1141-1147, review granted Feb. 14, 2018, S245893; *In re P.O.* (2016) 246 Cal.App.4th 288, 297-298;[3]

_____

computer or cell phone, the officer must merely act reasonably in pursuing that evidence. But a search would be unreasonable if there was no reasonable explanation for the extent of the officer's search. For instance, if an officer had suspicion that warranted reviewing the location history on a probationer's cell phone, it would not be reasonable to (for example) read personal text messages. If an officer had suspicion that a probationer set up a drug deal by text message the previous day, it would not be reasonable to read all his personal email, or to review his tax returns housed on his computer.

[3] Cases involving minors subject to suspicionless probation search conditions are applicable here, in my view. The majority distinguishes such cases on the ground that a special rule requires tailoring of conditions imposed on minors. (Maj. opn., *ante*, at p. 34.) But when the Court of Appeal decided *In re P.O.*, for example, it did not rely on such a special rule but on the same privacy and overbreadth principles that would apply to an adult. (*In re P.O.*, *supra*, 246 Cal.App.4th at pp. 297-298.) Generally speaking, courts have *greater* authority to impose probation conditions on minors, because minors lack the full constitutional rights of adults and are more in need of guidance. (E.g., *In re Sheena K.*, *supra*, 40 Cal.4th at p. 889.) A case now under review by our Supreme Court—the lead case of several dealing with probationary digital search conditions— involves a minor, and the Court of Appeal there struck down the search condition even after articulating the principle that a condition not permitted for an adult may be permitted for a minor. (*In re Ricardo P.* (2016) 241 Cal.App.4th 676, review granted

9

*People v. Appleton* (2016) 245 Cal.App.4th 717, 723-727 [condition overbroad even where crime involved internet]; but see, e.g., *People v. Nachbar* (2016) 3 Cal.App.5th 1122, 1128-1130, review granted Dec. 14, 2016, S238210 [electronic search condition not overbroad].) Having reached this conclusion, I would not reach the other challenges to the probation condition that Salcido raises.

II.

The majority appropriately recognizes that a probation search must not be "harassing, arbitrary, or capricious." (Maj. opn, *ante*, at p. 33.) But constitutional rights are not protected by an abstract principle. Once we have authorized warrantless, suspicionless searches of a probationer's cell phone and other digital devices, we have, at least as a practical matter, insulated harassing and arbitrary searches from review. And we have done so in an area—an individual's potentially vast reservoir of digital information—that the United States Supreme Court has instructed merits heightened protection from intrusion. Under the condition we affirm today, a probation officer (or a police officer) may thoroughly search defendant Salcido's cell phone and computers at any time for no articulable reason at all. That condition is not "closely tailor[ed]" to the legitimate purposes of monitoring her on probation or preventing her future crimes. (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.) It is overbroad.

Feb. 17, 2016, S230923.) The majority's view here articulates an odd state of affairs that is the opposite of that principle: an adult probationer can be subject to a condition authorizing a suspicionless search of her cell phone at any time; a juvenile probationer is protected from such a condition.

A citizen *not* on probation cannot have her cell phone or computer searched absent probable cause and a warrant. It is reasonable to treat probationers differently due to their diminished rights. The U.S. Supreme Court has held that when an officer has "reasonable suspicion that a probationer . . . is engaged in criminal activity, . . . an intrusion on the probationer's significantly diminished privacy interests is reasonable." (*Knights*, *supra*, 534 U.S. at p. 121.) Under what I think is the most appropriate application of the Fourth Amendment authorities we have, I would require that reasonable suspicion standard of blanket electronic search conditions, at least where the probationer's crime did not involve the internet or computers. A warrantless and suspicionless digital search could be based on some ground that is tailored to the probationer in advance, as part of the conditions of probation, or it could be based on reasonable suspicion that the probationer has committed a crime or other probation violation. But it should have some such articulable basis. Where digital evidence is concerned, we should ensure that "the Fourth Amendment [does not] fall[] out of the picture entirely." (*Riley*, *supra*, 573 U.S. at 392.)

RAPHAEL

J.

11